IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIGIO TORRES and IRENE CORREA,  )<br>    Plaintiffs,  )<br>)<br>    v.  )<br>)<br>CITY OF CHICAGO, HENRY PENA,  )<br>HECTOR ROMERO, and ANDREW  )<br>ROWE,  )<br>    Defendants.  ) | Case No. 12 C 7844<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

For Eligio Torres and his girlfriend, Irene Correa, the evening of October 1, 2010, began with the peaceful preparation of food in a neighbor's kitchen. By the end of the night, both Torres and Correa had an encounter with Chicago police officers that led to the filing of state court criminal charges against them. After being vindicated in state court, this civil rights action pursuant to 42 U.S.C. § 1983 followed. The defendants (the City of Chicago and the three Chicago police officers involved in the incident at issue in this case) move to strike portions of the plaintiffs' Local Rule 56.1 submissions and for partial summary judgment as to the vast majority of the plaintiffs' seven-count complaint. For the following reasons, the defendants' motions are denied.

### I. BACKGROUND[1]

Eligio Torres and his girlfriend, Irene Correa, resided at 3227 West Pierce Street in Chicago's Humbolt Park neighborhood. On October 1, 2010, Torres and Correa were at a

---

[1] The defendants filed a motion to strike certain responses to their statement of facts and most of the plaintiffs' statement of material facts. The defendants argue, among other things, that the plaintiffs' submissions are prolix, argumentative, irrelevant, and inaccurate. The motion to strike is denied since the relevant facts summarized in this order are drawn from both parties' submissions and are supported by the record.

neighbor's home making Belizean tamales with the neighbor and his family. Torres departed at approximately 10:30 p.m. and headed towards his car, which was parked in a nearby carport across the alley from the neighbor's home and behind the residence at 3227 West Pierce Street. Correa remained in the neighbor's kitchen and continued to cut up vegetables. Meanwhile, Chicago Police Officers Henry Pena and Hector Romero were in the vicinity – wearing civilian clothing, bulletproof vests, duty belts, and their police badges, and driving an unmarked police car – in connection with a "flash message" about a nearby shooting that had "very recently occurred" approximately one mile away from 3227 West Pierce Street. (Dkt. 57, Def. Mem. at 22.)

The paths of Torres, Correa, Pena, and Romero converged after the officers learned that the last known address of the individual suspected of being responsible for the shooting was 3227 West Pierce Street. After hearing about the shooting, Pena and Romero drove to 3227 West Pierce Street and encountered Torres as he approached his car. The next events are disputed, but the parties agree that Correa heard Torres scream and honk the horn of his car.

Correa testified at her deposition that when she realized Torres was responsible for the noise, she ran outside and saw a man (who turned out to be Pena) hitting Torres, who was sitting in the driver's seat of his car. After Correa entered the carport, she saw another man wearing dark clothing standing by the passenger door of Torres' car. Correa contends that she thought her boyfriend was being robbed. Based on this belief, she pushed Pena from behind (a vantage point that prevented her from seeing the police badge on the front of Pena's shirt) using both of her hands, in the direction of the car. Pena turned around after Correa pushed him. In her deposition, Correa stated that Pena punched her in the mouth, causing her to take a few steps

back. Pena and Correa "got into some words" and Pena pulled out a canister of Mace. (Correa Dep. at 62:1-3.) At this point, Correa could see Pena from the front and realized that he was a police officer.

Correa's oral statement to the Independent Police Review Board, which was transcribed, differs in certain respects from her deposition testimony. In her oral statement, Correa recounted that she arrived at the carport and began screaming at a man (Pena) standing by the driver's side of Torres' car. Correa yelled, "What the hell, he's not doing anything. We live right here." (Def. Ex. 6 at 11:12-15). Pena turned around and Correa saw his police vest and stepped back. She said, "[O]h shit, this is the police" and continued to yell, "Like, 'What the fuck, he didn't do anything. He lives right here." (*Id*. at 11:17-24, 12:5-6.) As she yelled, Pena punched her in the face and her lip began to gush blood.

Pena provides a third version of events. Pena asserts that when Correa arrived at the carport, she pushed him and that after she did so, he hit her in the face. It is undisputed that after Correa received a blow to her face, she was arrested and removed from the scene. Charges of felony aggravated battery and obstruction of a police officer followed.

Meanwhile, Torres' troubles with the police were not over. Stepping back in time to Torres' arrival at the scene, Pena and Romero observed Torres walking from a residence on West La Moyne Street (which is parallel to West Piece Street) towards his carport on West Piece Street.[2] Torres entered his car, and Pena and Romero positioned their unmarked police car behind Torres' car so he could not leave his parking space.

---

[2] In their reply, the defendants state that they erred when they represented elsewhere that the officers saw Torres walk out of a gangway at 3227 West Pierce Street. (Dkt. 74, Defs.' Reply, at 11.)

The events at the carport are disputed, but the parties agree that Torres ended up in an altercation with Pena, Romero, and Andrew Rowe, a third officer who arrived at the scene in response to a call for assistance. When Rowe arrived, Torres was handcuffed to the steering wheel of his car. Either Pena or Romero told Rowe that Torres had fought the two officers, that Torres needed to be removed from his car, and that the two officers wanted a Taser at hand in case the situation got out of control.

One of the officers uncuffed Torres from the steering wheel. The parties dispute whether Torres was immediately recuffed but agree that Torres rapidly exited his car when he saw an officer hit Correa in the face. The defendants assert that Torres kicked Pena in an act of aggression immediately after Torres was removed from his car. In contrast, Torres testified at his deposition that he "could have kicked [Pena] maybe like brushed off his leg, you know, real lightly." (Torres Dep. at 72:20-73:5.)

Upon exiting his car, Torres contends that he ran towards Correa, who was near the rear of his car in the confined area of the carport. After Torres took two or three steps, Rowe shot Torres with his Taser and Torres fell to the ground. The officers claim that this use of force was necessary to subdue Torres. Torres claims that he was handcuffed and surrounded by three officers in a small carport and that the use of the Taser was gratuitous. The parties agree that Rowe shot Torres a second time with the Taser while Torres was lying on the ground. Torres received medical treatment and was arrested and charged with felony aggravated battery to a police officer.

After a jury trial in state court, Correa and Torres were found not guilty. This seven-count civil rights lawsuit based on 42 U.S.C. § 1983 and Illinois law followed. The plaintiffs

contend that: (1) Pena, Romero and Rowe used excessive force against Torres by hitting him in the head and "tasering him at least twice" (Count I); (2) Pena used excessive force against Correa by punching her in the face (Count II); (3) Pena, Romero and Rowe falsely arrested Correa (Count III); (4) Pena and Romero unreasonably seized Torres because they lacked a reasonable suspicion that he had committed a crime or was about to commit a crime (Count IV); (5) the defendant officers maliciously prosecuted Correa and Torres in violation of Illinois law (Counts V and VI, respectively); and (6) the City must indemnify the defendant officers in connection with any judgments for compensatory damages (Count VII). The defendants seek summary judgment as to portions of Counts I and VII and as to Counts II, III, IV, V, and VI in their entirety.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. DISCUSSION

### A. Excessive Force

#### 1. Torres – First Use of Taser (Part of Count I)

The defendants seek partial summary judgment as to Count I. Specifically, they assert that Rowe is entitled to summary judgment regarding his first use of the Taser on Torres based evidence showing that Rowe's use of force was clearly justified.

The court reviews Torres' excessive force claim using the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Under this standard, the court must examine the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000). Once the relevant events have been established – either at trial or through submission of undisputed facts – the court, not a jury, must determine if the officer's actions were objectively reasonable. *Bell v. Irwin*, 321 F.3d 637, 640-41 (7th Cir. 2003).

Rowe contends that Torres' description of events shows that he was acting in an aggressive manner immediately prior to being tased and stresses that Torres admitted that he kicked Pena and was fleeing when Rowe deployed the Taser. Thus, Rowe concludes that his first use of the Taser was "objectively reasonable and not excessive in any way." (Def. Reply, Dkt. 74, at 5.) The court has read Torres' deposition, including his definition of his contact with Pena as a "kick[] . . . maybe like brushed off his leg, you know, real lightly." (Torres Dep. at 72:20-73:5.) It has also considered Torres' description of his movements immediately after exiting his car (an attempt to flee the scene, according to the defendants, or an attempt to come to

the aid of his girlfriend, who had just been hit in the face and was standing at the rear of Torres' car, which was parked in a carport). Based on the current record, the court cannot determine if Rowe's use of force was justified.

Rowe argues that even if the court denies his motion for summary judgment on the merits, he is still entitled to qualified immunity because "no case law existed at the time which would have put [him] on notice that tasering an aggressive, noncompliant arrestee even though handcuffed, was not lawful." (Def. Reply, Dkt. 74, at 6.) The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. City of Chic.*, 733 F.3d 749, 758 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted)). When evaluating whether qualified immunity applies, the court must ask "two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Id*.

For the purposes of qualified immunity, Rowe accepts Torres' claim that he was handcuffed when Rowe first tased him. Critically, however, he characterizes Torres's behavior immediately prior to being tased as "aggressive" and "noncompliant" and adheres to his version of events (that Torres kicked him immediately before attempting to flee the scene). (Def. Reply, Dkt. 74, at 6.) Rowe has, therefore, not accepted the facts in the light most favorable to Torres. Thus, his so-called "qualified immunity" argument is merely a rehashing of his argument about

the merits. Accordingly, Rowe is not entitled to qualified immunity and the defendants' motion for partial summary judgment as to Count I is denied.

> 2.  **Excessive Force – Correa (Count II)**

The defendants ask the court to find that Pena acted reasonably when he hit Correa in the face after Correa pushed him. They stress that at the time Pena hit Correa, there was a great deal of noise and commotion in the carport and Pena believed he was in close proximity to an individual who may have been a suspect or a material witness to a shooting.[3] They also assert that "[e]ven if Correa stepped back after pushing [Pena], punching her once to subdue her was not an unreasonable use of force when viewed in the context of the circumstances that faced [Pena] that night." (Def. Reply, Dkt. 74, at 7.)

There is a material disputed issue of fact as to whether Correa stepped back from Pena before he hit her in the face. As noted above, the court must view the facts in the light most favorable to the plaintiffs. This means the court will not narrowly construe Correa's deposition testimony about her encounter with Pena and find that Correa admitted that she did not step back prior to being hit, and then compare that finding with Correa's Independent Police Review Board testimony stating that she did step back and reject that testimony as untruthful. Given the questions asked at Correa's deposition and the nature of the discrepancies between her two versions of her encounter with Pena, a jury will have to determine if she and Pena are being

---

[3] The court notes that the defendants describe the carport area as "confined" when discussing Pena's use of force on Correa. (Def. Reply, Dkt. 74, at 7.) This appears to be inconsistent with their position that Torres tried to flee immediately upon exiting his car. Specifically, a reasonable jury could find that an individual moving in a small, confined space with three police officers and another person was moving towards his injured girlfriend, as opposed to attempting to leave the scene quickly.

truthful and if Pena acted reasonably by "punching Correa one time" in order to "neutralize any threat she posed" to the officers at the scene. *Id.*

As with Torres, the defendants claim that even if the court does not find that Pena acted reasonably when he struck Correa in the face, Pena is entitled to qualified immunity. The defendants argue that the "minimal force used to subdue Correa" was a reasonable action taken to "neutralize the threat to his safety." *Id.* This argument is wholly unpersuasive. Was the force "minimal"? What was Correa doing immediately before Pena, to use the defendants' description, punched her in the face to subdue her? Was it necessary to "subdue" Correa? These fact questions mean that Pena is not entitled to qualified immunity and the defendants' motion for summary judgment as to Count II is denied.

**B.     False Arrest – Correa (Count III)**

Correa contends that Pena, Romero and Rowe falsely arrested her. Probable cause to arrest is an absolute defense to any claim against police officers under § 1983 for false arrest. *Wagner v. Wash. Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007). "Police ordinarily have probable cause if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The court assesses probable cause objectively, considering the facts as they reasonably appeared to the arresting officer, "seeing what he saw, hearing what he heard, and so forth." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction. *Id.*

"Based as it is on probabilities rather than hard certainties, the probable-cause standard inherently allows room for reasonable mistakes." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). When facts sufficient to create probable cause are undisputed, probable cause is a question of law. *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999), overruled on other grounds by *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir.1999).

Correa argues that the court must accept her version of events, which includes her assertion that she did not know that Pena was a police officer when she pushed him towards Torres' car using both hands. She reasons that because the offenses of aggravated battery to a police officer and obstruction of a police officer require proof that she knew that Pena was a police officer, her alleged lack of knowledge about this key fact is sufficient to survive summary judgment.

"Illinois follows the common law rule that any contact, however slight, may constitute a battery." *Gill v. Vill. of Melrose Park*, No. 12 C 2963, — F. Supp. 2d —, 2014 WL 1257961, at *4 (N.D. Ill. Mar. 27, 2014) *(*quoting *Garcia-Meza v. Mukasey*, 516 F.3d 535, 538 (7th Cir. 2008)). "[P]hysical contact between an arrestee and a law enforcement officer, however minor, can provide probable cause for battery." *London v. Harris*, 09 C 7797, 2013 WL 1405250, at *6 (N.D. Ill. Apr. 5, 2013) (internal quotations omitted). Nevertheless, "[i]t cannot be that any contact with a civilian – an accidental brush at Taste of Chicago, an inadvertent bump on the El, or an incidental shoulder while exiting Wrigley Field – may be deemed an insult or provocation sufficient to justify an arrest for battery." *Id*. at *6 (quoting *Mihalko v. Daley*, No. 01 C 4846, 2002 WL 726917, *6 (N.D. Ill. Apr. 24, 2002)). Context is thus critical. A citizen's unintentional and insignificant contact with a police officer is not actionable. In contrast, "an

individual angry at being given a parking ticket" who "crumple[s] up the ticket and throw[s] it on the ground" could "face charges of aggravated battery if the ticket hit the issuing officer's shoe." *Garcia-Meza*, 516 F.3d at 538.

Here, Correa does not dispute that she pushed Pena. She claims that when she did so, she did not know that he was a police officer. The defendants argue that Correa's state of mind is irrelevant because regardless of whether she knew Pena was a police officer, she still committed battery by pushing him. This is beside the point. Correa was not charged with plain vanilla battery. See 720 Ill. Rev. Stat. § 5/12-3 (battery is a Class A misdemeanor and occurs when a person "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual").

Instead, she was charged with felony aggravated battery and obstruction of a police officer, both of which require the charged individual to know that she is interacting with a police officer. *See* 720 Ill. Rev. Stat. § 5/12-4(b)(18) (aggravated battery); 720 Ill. Rev. Stat. § 5/31-1(a) (obstruction of a peace officer). Accepting the facts in the light most favorable to the plaintiffs, Correa stepped back once she realized Pena was a police officer and said "oh shit, this is the police." (Def. Ex. 6 at 11:17-24.) If Correa had been charged with battery, the defendants would be entitled to summary judgment. However, because the police brought charges requiring knowledge of Pena's status of a police officer at the time of the shove, disputed issues of fact prevent the court from finding, as a matter of law, that probable cause supported Correa's arrest for felony aggravated battery and obstruction of a police officer.

The court rejects the defendants' back-up qualified immunity argument. This argument is based on the same premise as their argument on the merits regarding Correa's false arrest

claim: that a reasonable officer would have thought that probable cause supported arresting Correa because she unquestionably placed both of her hands on Pena's back and pushed him towards Torres' car. As discussed above, this is not the correct inquiry since Correa was not charged with misdemeanor battery. Pena is thus not entitled to qualified immunity and the defendants' motion for summary judgment as to Count III is denied.

**C.     Unreasonable Seizure – Torres (Count IV)**

The court next turns to Torres' Fourth Amendment unreasonable seizure claim. As the Seventh Circuit recently explained:

> The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily seizures are "reasonable" only when supported by probable cause to believe an individual has committed a crime. *See*, *e.g.*, *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Bailey v. United States*, — U.S. —, 133 S.Ct. 1031, 1037 (2013). The longstanding exception to this rule arises under *Terry v. Ohio*, 392 U.S. 1 (1968), which authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot, *id.* at 21-22; *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Determining whether such an investigatory detention is constitutional requires balancing the governmental interest in the seizure against the degree to which it intrudes on an individual's personal liberty. *See id.* at 20-21. And although reasonable suspicion is a less demanding standard than probable cause, such a stop requires at least a minimal level of objective justification and the officer must be able to articulate more than an "inchoate and unparticularized suspicion or "hunch" of criminal activity. *Id.* at 27; *see also Ill. v. Wardlow*, 528 U.S. 119, 123-24 (2000). Ultimately, determining whether reasonable suspicion exists is not an exact science, and "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

*Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014).

The defendants contend that when Pena and Romero parked their unmarked police car behind Torres' car so he could not exit from his carport, they conducted a permissible

-12-

investigatory stop. As noted above, according to Pena and Romero, they received a "flash message" about a nearby shooting that had "very recently occurred" approximately one mile away from 3227 West Pierce Street. (Dkt. 57, Def. Mem.., at 22.) The message stated that the suspect's last known address was 3227 West Pierce Street. The officers did not have a description of the suspect. Upon their arrival at 3227 West Pierce Street, the officers saw Torres walking from a residence on West La Moyne street across the alley to the carport at 3227 West Pierce Street so they blocked his car with their unmarked police car, thereby detaining Torres. The defendants argue that these circumstances caused Pena and Romero to have "a reasonable, articulable suspicion that Torres had been, was, or was about to engage in a criminal activity, namely, the recent shooting they were investigating." (*Id*.)

Torres stresses that given the short amount of time that elapsed between the shooting and the officers' arrival at his carport approximately one mile away, it would be highly unlikely for the shooter to be at 3227 West Piece Street when the officers arrived. The record does not specify how much time elapsed between the "flash message" and the officers' arrival at the scene. The fact that the shooting had "very recently occurred" could refer to a range of times, but the shorter the interval, the more likely it is that the officers stopped Torres due to a hunch as opposed to a reasonable suspicion of wrongdoing. *See Snider v. Pekny*, 899 F. Supp. 2d 798, 810 (N.D. Ind. 2012) ("Whether [the defendant officer] reasonably suspected that [the plaintiff] and his guests were engaged in wrongdoing, or whether he was operating on nothing more than a hunch, is a critical question."). This is a fact question.

Moreover, the defendants' argument makes no sense. They posit that Pena and Romero suspected that "Torres had been, was, or was about to engage in a criminal activity, namely, the

recent shooting they were investigating." (Dkt. 57, Def. Mem.., at 22.) A stop based on a suspicion that an individual "was, or was about to," perform a shooting that had already occurred a mile away is impossible barring the ability to engage in time travel. A stop based on this rationale is thus per se unreasonable.

The only remaining basis for the officers' alleged suspicion that Torres was the shooter were the facts that he is male and was outside the address of the individual suspected of being responsible for the shooting shortly after the shooting occurred. Given the open fact question about timing, these facts are insufficient as a matter of law to establish that the officers' actions were proper.

Moreover, the parties dispute what happened when Pena and Romero encountered Torres. While they agree that Torres ended up handcuffed to his steering wheel, they dispute when and why the handcuffs were applied. "[A]lthough [the Seventh Circuit has] upheld the use of handcuffs to ensure officer safety in a *Terry* stop of brief duration, without automatically escalating the situation to an arrest, that does not mean that law enforcement has carte blanche to handcuff routinely." *Ramos v. City of Chi.*, 716 F.3d 1013, 1018 (7th Cir. 2013). Torres asserts that the officers blocked his car with their car, approached from behind, pulled his door open, and immediately handcuffed him. The court must accept this version of the facts for the purposes of the defendants' summary judgment motion. If accepted, these facts could support the conclusion that the stop was a de facto arrest requiring probable cause, as opposed to an investigatory stop. *See id*. (collecting cases); *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) ("A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive.").

In the interests of completeness, the court notes that the defendants also appear to be arguing that in the state court proceedings, the state court judge found that the officers had conducted a valid *Terry* stop. (Dkt. 57, Defs.' Mem., at 24.) Something that occurred after the fact in the state court criminal case cannot speak to whether Pena and Romero believed that probable cause existed when they detained Torres.[4] *See United States v. Garrett*, 757 F.3d 560,. 567 (7th Cir. 2014) (quoting *United States v. Biggs*, 491 F.3d 616, 620 (7th Cir. 2007)) (holding that "the officers were required to have probable cause, or a reasonable belief, 'in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense'").

---

[4] In their response, Torres asserts that to the extent that the defendants are arguing that collateral estoppel prevents him from challenging the constitutionality of the officers' decision to prevent him from leaving his carport, that doctrine is inapplicable. In their reply, the defendants clarify that they are not asserting collateral estoppel and state that they referenced the state court proceedings "to suggest that this [c]ourt adopt the sound reasoning of the Circuit Court." (Dkt. 74, Defs.' Reply, at 12.) This argument is unconvincing: either the state court's ruling binds Torres or it does not, leaving Torres open to litigate the constitutionality of the stop in this case. Generally, "[a] trial on the merits of a criminal citation tests whether the state can present sufficient evidence to prove a criminal defendant guilty beyond a reasonable doubt, it does not test the constitutionality of the officers' actions surrounding an arrest." *Mitchell v. Nesemeier*, No. 11 C 50329, 2013 WL 5587887, at *12 (N.D. Ill. Oct. 9, 2013). Torres, however, filed a motion to suppress in the state court criminal proceedings. In that motion, he argued that the initial seizure was improper. He thus litigated, to at least some extent, the constitutionality of the seizure in state court. Nevertheless, in this case, Torres asserts that he did not have a full and fair opportunity to develop his constitutional claim in state court. For example, he stresses that in the criminal case, an officer testified that Torres walked out of the home at 3227 West Pierce Street immediately before he was stopped. In contrast, in this case, the parties agree that Torres left a home on West La Moyne Street immediately before he was stopped. Based on the current record, the court finds that Torres may proceed with his present federal court challenge to the constitutionality of his seizure and declines the defendants' invitation to adopt the state court's findings about the seizure.

Accordingly, Pena and Romero are not entitled to summary judgment as to Torres' unreasonable seizure claim. The fact questions outlined above mean that they are also not entitled to qualified immunity as to this claim.

**D.     Malicious Prosecution – Torres and Correa (Counts V and VI)**

Correa and Torres argue that the defendant officers violated Illinois law by maliciously prosecuting them for aggravated battery (Counts V and VI, respectively). "In order to prevail on a malicious prosecution claim [in Illinois], a plaintiff must establish '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Holland v. City of Chi.*, 643 F.3d 248, 254 (7th Cir. 2011) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). In this case, elements three and four are at issue.

   **1.     Probable Cause**

The court has already rejected the defendants' argument that it is entitled to summary judgment because probable cause supported Correa's arrest for aggravated battery. With respect to Torres, the defendants contend that "[s]hould this court find that Defendant Officers had probable cause to seize and arrest Torres, that fact alone causes Torres' malicious prosecution claim to fail as a matter of law." (Dkt. 57, Defs.' Mem., at 25.) The flaw with this argument is that Torres' malicious prosecution claim is based on a charge of aggravated battery. Thus, the purported existence of probable cause to seize and arrest Torres is not germane to whether probable cause supported the charge of aggravated battery. *See Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682-83 (7th Cir. 2007) ("probable cause to believe an individual

committed one crime – and even his conviction of that crime – does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge"). Moreover, the parties dispute whether Torres was combative and whether he kicked Pena in the leg or inadvertently touched him in a glancing fashion. As discussed above, the trier of fact will have to determine what happened on the night of Torres' arrest. Because the court does not know what happened, it cannot determine if probable cause existed.

        **2.**      **Malice**

The "malice" element of malicious prosecution exists when the "the officer who initiated the proceedings was motivated by something other than a desire to bring a guilty party to justice." *Seiser v. City of Chi.*, 762 F.3d 647, 659 (7th Cir. 2014). Under Illinois law, "[i]t is well established that a jury can infer malice from an absence of probable cause." *Williams v. City of Chi.*, 733 F.3d 749, 760 (7th Cir. 2013) (collecting cases). Given that the existence of probable cause is disputed and the parties' divergent view of the facts, the court finds that summary judgment on this element is inappropriate. Accordingly, the defendants' motion for summary judgment as to the plaintiffs' malicious prosecution claims is denied.

**E.**      **Indemnification as to the Counts that are the Subject of the Defendants' Motion for Summary Judgment (Part of Count VI)**

The defendants' final argument is that they are entitled to summary judgment on the plaintiffs' indemnification claim because the plaintiffs have failed to establish that any of the defendant police officers engaged in a constitutional violation. The court has rejected their request for summary judgment in its entirety. Thus, the defendants' motion for summary judgment on the plaintiffs' indemnification claim is denied.

### IV. CONCLUSION

At the summary judgment stage, the court's task is to decide if any triable issues of fact exist. For the reasons stated above, the court rejects the defendants' attempt to convince it that any portion of this case can be resolved via a motion for summary judgment. Accordingly, the defendants' motion for partial summary judgment [55] is denied in its entirety. In addition, the defendants' motion to strike portions of the plaintiffs' Local Rule 56.1 submissions [76] is denied.


Date:   December 19, 2014                                  /s/
                                                     Joan B. Gottschall
                                                     United States District Judge