**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ELIGIO TORRES and IRENE CORREA,** | ) | |
| **Plaintiffs,** | ) | **Case No. 12 C 7844** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **CITY OF CHICAGO, HENRY PENA,** | ) | |
| **HECTOR ROMERO, and ANDREW** | ) | |
| **ROWE,** | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The parties' post-trial motions in this § 1983 case against three City of Chicago police officers and the City of Chicago are before the court. For the following reasons, the plaintiffs' motion for judgment as a matter of law and defendant Henry Pena's motions for judgment as a matter of law, for a new trial, to alter judgment, to amend the judgment, and, in the alternative, for remittitur are denied.

## I. BACKGROUND

The court begins with observations about the general lack of citations to the record and authority in the defendants' post-trial submissions and then moves on to a recap of the jury's verdict.

### A. The Defendants' Post-Trial Submissions

The defendants (who are represented by very experienced trial counsel) frequently fail to include citations to the trial transcript in their submissions. The lack of consistent citations to the trial transcript forced the court to hunt through the record in an effort to guess what portions the defendants meant to reference. *See Ayala v. Rosales*, No. 13 C 4425, 2015 WL 4127915, at *1 (N.D. Ill. July 8, 2015). The court "has attempted to the best of its ability to address [the

defendants'] claims on the merits" despite the defendants' decision to provide sporadic record citations. *Id*. However, "any arguments lacking necessary record support are, in the first instance, denied as waived." *Id*. (collecting cases holding that a defendant waives an argument to the extent that citation to the record is necessary to support his position and he fails to provide a citation).

Relatedly, the defendants frequently make conclusory statements, unadorned by explanation, citations to the record, or citations to authority. For example, in their response to the plaintiffs' Rule 50 motion, they assert that "[i]t was reasonable for the officers to believe that Campbell may have fled to his last known address, 3227 W. Pierce, after the shooting." (Dkt. 159 at 8.) Why? And what is this based on? Similarly, in their response to the plaintiffs' Rule 50 motion, they contend that the officers did not seize Torres because he did not know that they had blocked his car with their unmarked squad car. (Dkt. 159 at 7.) Where is the record citation, as well as citations to supporting legal authority and discussion of that authority?

Underdeveloped, conclusory, or legally unsupported arguments are deemed waived. *See*, *e.g.*, *Johnson v. Bellwood Sch. Dist. 88*, No. 14 C 10498, 2016 WL 3476660, at *6 (N.D. Ill. June 27, 2016) (citing *C & N Corp. v. Gregory Kane & Ill. River Winery, Inc.*, 756 F.3d 1024, 1026 (7th Cir. 2014). The court need not "speculate as to the details of [an] unexplained argument." *Id*. It also declines to conduct legal research in an effort to locate support (to the extent it might exist) for unsupported legal contentions. *See*, *e.g.*, *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel"); *United States v. Betts-Gaston*, 142

F. Supp. 3d 716, 732 (N.D. Ill. 2015) ("the Court cannot discern . . . where in the transcript [counsel] is referring, and finds that these arguments are waived").

The defendants' failure to provide citations to the record and legal authority for each and every assertion of fact and law, respectively, is notable because as discussed below, the defendants ask the court to construe the rules governing the timeliness of post-trial motions strictly and to find that the plaintiffs' post-trial motion is untimely. The defendants cannot request strict construction when it benefits them yet fail to follow the rules themselves. This is especially true given that the defendants' presentation makes it difficult if not impossible for the plaintiffs (as well as the court) to understand the complete basis for all of the defendants' arguments. The court will do as the defendants ask and strictly apply the rules, but will do so across the board for all parties. With this in mind, the court turns to the merits of the parties' post-trial motions.

**B.      The Jury Verdict**

Plaintiff Eligio Torres and Irene Correa filed a § 1983 action against the City of Chicago and Chicago police officers Henry Pena, Hector Romero, and Andrew Rowe based on an incident on October 1, 2010. Familiarity with the facts is assumed for the purposes of this opinion; the court will discuss specific portions of the record as necessary below. In a nutshell, after a five-day jury trial, the jury found in favor of Pena and Romero on Torres' unreasonable seizure and excessive force claims and in favor of Pena on Correa's excessive force claim. The jury further found in favor of the plaintiffs on their malicious prosecution claims against Pena. The jury awarded $40,000 in compensatory damages and $60,000 in punitive damages to Torres and $30,000 in compensatory damages and $45,000 in punitive damages to Correa.

## II.   The Parties' Motions for Judgment as a Matter of Law

Both Torres and Pena have renewed their Rule 50 motions for judgment as a matter of

law.  In their Rule 50 motion, Torres argues that he is entitled to judgment as a matter of law on

his Fourth Amendment claim because the officers seized him when they used their car to block

his car into its parking space based merely on his gender and proximity to the address of an

alleged shooter.  The defendants argue that the plaintiffs' motion is untimely and is thus

governed by Rule 60, and that, in any event, it fails on the merits.  In his Rule 50 motion, Pena

contends that no reasonable jury could find that: (1) he lacked probable cause to arrest and

charge Correa with aggravated battery; (2) he lacked probable cause to arrest and charge Torres

with aggravated battery; and (3) he acted maliciously in commencing the prosecution of the

plaintiffs.

### A.     Timeliness

Under Federal Rule of Civil Procedure 50(a)(1):

> If a party has been fully heard on an issue during a jury trial and the court finds
> that a reasonable jury would not have a legally sufficient evidentiary basis to find
> for the party on that issue, the court may:  (A) resolve the issue against the party;
> and (B) grant a motion for judgment as a matter of law against the party on a
> claim or defense that, under the controlling law, can be maintained or defeated
> only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  A party must file a Rule 50 motion "[n]o later than 28 days after the

entry of judgment."  Fed. R. Civ. P. 50(b).

Here, the court entered an amended judgment on December 23, 2015, so pursuant to Rule

50(b), the plaintiffs' Rule 50 motion was due by January 20, 2016.  At the defendants' request,

however, the court extended the due date for all post-trial motions to February 18, 2016.[1]  The plaintiffs filed their post-trial motion on that date.  In response, the defendants assert that the court lacked the authority to extend the time to file a Rule 50 motion so the plaintiffs' motion is untimely.

First, the defendants' arguments about timeliness appear to apply equally to their own post-trial motions.  The defendants attempted to avoid the trap they set by affirmatively asking for a sixty-day extension of the date for post-trial motions by filing a five-page motion on January 15, 2016. (Dkt. 144 at 2.)  This filing repeated that post-trial motions were due by February 18, 2016, "pursuant to [the] court's briefing schedule" and indicated that the defendants would file a memorandum in support by that date.  (*Id*. at 2.)  Critically, the motion contains a summary of the defendants' arguments with no citations to supporting authority.  As discussed above, legally unsupported arguments are waived.  *See*, *e.g.*, *Johnson*, 2016 WL 3476660, at *6.  To the extent that the defendants provided citations to authority and the record, they did so in their memorandum, which they filed on February 18, 2016 (Dkt. 153), as did the plaintiffs (Dkt. 149).  The court need not, however, determine if the defendants' cursory initial presentation of their post-trial issues is sufficient as it does not affect the result.

The plaintiffs agree that the court cannot extend the date to file post-trial motions.  *See Blue v. Int'l Bhd. of Elec. Workers Local Union*, 159, 676 F.3d 579, 582 (7th Cir. 2012); *Aponte*

---

[1]  Specifically, when defense counsel indicated that the defendants intended to file post-trial motions, the court stated, "I think the rules say that if you don't want to do it by the schedule that the rules provide which I remember, I need to give you time, this is the only time I can do it."  (Dec. 18, 2015 Tr. at 51.)  Defense counsel then stated, "We'd like 60 days" and the court accepted this suggestion: "60 days. Any motions on the plaintiff's side?  Well, if you want to file them, 60 days."  (*Id*.)

*v. City of Chicago*, No. 09 C 8082, 2012 WL 1533309, at *1 (N.D. Ill. Apr. 26, 2012).

Nevertheless, they urge the court to grant their post-trial motion based on Rule 60. This relief is

available to courts faced with untimely Rule 50 motions. *Blue*, 676 F.3d at 584-85. A Rule 60

motion does not "affect [a] judgment's finality or suspend its operation." Fed. R. Civ. P.

60(c)(2). Among other things, the court can grant a Rule 60 motion based on "mistake,

inadvertence, surprise, or excusable neglect" or the "catch-all" clause ("any other reason that

justifies relief"). Fed. R. Civ. P. 60(b)(1) & (6).

The "'mistake' and 'inadvertence' language of subsection (1) . . . includes inadvertence

on the part of both courts and parties." *Mendez v. Republic Bank*, 725 F.3d 651, 658 (7th Cir.

2013). Thus, "subsection (1) of Rule 60(b) allows a district court to correct its own errors that

could be corrected on appeal, at least if the motion is not a device to avoid expired appellate time

limits." *Mendez v. Republic Bank*, 725 F.3d 651, 659 (7th Cir. 2013). Here, the plaintiffs' late

filing (and the date that Pena filed his memorandum supporting his post-trial motions) flowed

from the court's inadvertent error in granting the defendants' request for an extension of time for

all parties to file post-trial motions. Moreover, the defendants agree that the court may, in an

exercise of its discretion, consider the merits of the plaintiffs' motion for judgment as a matter of

law based on Rule 60. Thus, the court turns to the merits of the various post-trial motions.

**B.      Legal Standard for a Motion for Judgment as a Matter of Law**

Judgment as a matter of law is warranted if "a reasonable jury would not have a legally

sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). When

considering a Rule 50(b) motion, the court "construes the evidence strictly in favor of the party

who prevailed before the jury and examines the evidence only to determine whether the jury's

verdict could reasonably be based on that evidence." *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012); *see also Flournoy v. City of Chicago*, — F.3d —, No. 14-3776, 2016 WL 3924378, at *3 (7th Cir. July 21, 2016).

"[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Ultimately, the court must use its discretion to determine if "no rational jury could have rendered" the verdict. *See Saathoff v. Davis*, — F.3d —, No. 15-3415, 2016 WL 3386780, at *6 (7th Cir. June 20, 2016) (citing *EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016)); *see also United States v. Funds in the Amount of One Hundred Thousand Dollars*, No. 03 C 03644, 2016 WL 3459527, at *2 (N.D. Ill. June 24, 2016) (internal quotations omitted) ("the role of the court is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion").

## C.     The Plaintiffs' Motion for Judgment as a Matter of Law

### 1.     Relevant Evidence

Although much of what occurred on the night of October 1, 2010, is disputed, the parties largely agree on the facts that are relevant to the plaintiffs' motion for judgment as a matter of law.[2] On the evening of October 1, 2010, Officers Pena and Romero were on patrol in the 13th District. The officers heard a flash message on their police radio indicating that a shooting had just occurred near West Augusta Boulevard and North Francisco Avenue. The message

---

[2] Unlike other portions of their submissions, the fact section of the defendants' memorandum in support of their opposition to the plaintiffs' motion for a new trial includes record citations.

indicated that "Corey Campbell" was the shooter and that Campbell resided at 3227 West Pierce Avenue in Chicago. The officers agree that they did not have a description of Campbell (other than his gender, due to the use of the pronoun "he") as the message did not provide any information about Campbell, such as his age, race, height, build, hair color, hair length, facial hair, or clothing.

Officer Romero testified that the officers were two or three blocks away from the scene of the shooting when they heard the message. They drove "about a mile and a half" to 3227 West Pierce Avenue. (Dec. 15, 2015 Tr. at 79.) When the officers arrived, they entered the alley behind 3227 West Pierce Avenue. From their vantage point in their unmarked car, they did not see anyone exit the house. Instead, they espied a man (who turned out to be Torres) walking from the gangway alongside 3227 West Pierce Avenue towards a car parked in a carport located in the alley behind the residence next door at 3225 West Pierce Avenue. The officers testified that Torres was walking (not running) and that they did not observe him engaging in any illegal activity.

Due to his gender and propinquity to 3227 West Pierce Avenue, the officers wanted to interview Torres to determine if he was Corey Campbell. Thus, once Torres got into his car, they pulled their car behind Torres's car "to block him in" so he could not leave. (Dec. 17, 2015 Tr. at 5.) According to the officers, they immediately got out of their car—without running the license plates on Torres' vehicle— and approached Torres while yelling, "Chicago Police. Let me see your hands." (*Id*. at 6.)

Torres testified that he did not see the unmarked police car park behind his car. Instead, he saw two individuals (who he did not realize were police officers) approach his car from the

rear and go to the driver's and passenger's sides while he was sitting in the driver's seat with the window rolled down. The officers testified that they were not trying to sneak up on Torres and that Torres did not comply with their demand to show them his hands. From there, the situation rapidly escalated.

### 2. Torres' Fourth Amendment Seizure Claim

As the court stated when ruling on the defendants' motion for summary judgment:

> The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily seizures are "reasonable" only when supported by probable cause to believe an individual has committed a crime. *See*, *e.g.*, *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Bailey v. United States*, — U.S. —, 133 S.Ct. 1031, 1037 (2013). The longstanding exception to this rule arises under *Terry v. Ohio*, 392 U.S. 1 (1968), which authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot, *id.* at 21-22; *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Determining whether such an investigatory detention is constitutional requires balancing the governmental interest in the seizure against the degree to which it intrudes on an individual's personal liberty. *See id.* at 20-21. And although reasonable suspicion is a less demanding standard than probable cause, such a stop requires at least a minimal level of objective justification and the officer must be able to articulate more than an "inchoate and unparticularized suspicion or "hunch" of criminal activity. *Id.* at 27; *see also Ill. v. Wardlow*, 528 U.S. 119, 123-24 (2000). Ultimately, determining whether reasonable suspicion exists is not an exact science, and "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

*Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014).

"A Fourth Amendment seizure is 'not a continuous fact'; it is a single act that occurs at a discrete point in time." *United States v. Mays*, 819 F.3d 951, 955-56 (7th Cir. 2016) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)). Officers effect a seizure through the use of physical force or "through a show of authority and submission to the assertion of authority." *Id.*

(quoting *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011)). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. California*, 551 U.S. 249, 262 (2007).

The plaintiffs argue that they are entitled to judgment as a matter of law as to Torres' Fourth Amendment claim because (1) the officers' decision to block Torres with their unmarked squad car was a seizure[3] and (2) the officers lacked any reasonable suspicion to believe that Torres had committed, was committing, or was about to commit a crime. In response, the defendants argue—without citation to any authority—that Torres could not have believed that his liberty was restrained by the positioning of their squad car because he did not know that the squad car was parked behind his car. The court's consideration of Torres' Fourth Amendment claim begins and ends with the seizure element.

The plaintiffs' authority all involves shows of authority based on police cars that were visible to individuals who were the subjects of investigatory stops. In *United States v. Green*, the officers blocked a driveway with their car. 111 F.3d 515, 517 (7th Cir. 1997). After the driver exited, the police yelled that they wanted to speak with him, obtained identification, and asked the passenger, who was still in the car, for identification. *Id.* They then returned to the

---

[3] The plaintiffs' motion does not clearly articulate whether the seizure consists of the officers' decision to block Torres' car or a combination of blocking him and going to both sides of his car. The plaintiffs' reply, however, clarifies that the plaintiffs' seizure claim is based on the blocking of Torres' car. This makes sense, as Torres testified that he did not initially realize that the two men who approached his car were police officers. Thus, for Torres to prevail on his Fourth Amendment claim, he must establish that a seizure occurs when an individual is physically blocked from leaving but erroneously believes that he can leave because he is unaware that he has been blocked.

-10-

squad car to check for warrants and discovered that the passenger had an outstanding warrant. *Id*. While *Green* does not specifically state that the occupants of the car were aware that a squad car was parked so that they could not drive away, the chronology of the stop makes clear that they would have seen the squad car. In *United States v. Packer*, squad cars with illuminated "take down lights" were parked in front and behind the defendant's car. 15 F.3d 654, 657 (7th Cir. 1994). In *United States v. Lechuga*, squad cars "sandwiched" the defendant's car by blocking him from the front and back. 925 F.2d 1035, 1037 (7th Cir. 1991); *see also United States v. Bean*, No. 15-CR-146, 2016 WL 3383283, at *4 (E.D. Wis. June 17, 2016) (collecting cases that consider whether officers conducted a seizure by stopping cars using a show of force, such as activating the lights on their squad car or blocking the targets' cars with their own car).

These cases are all distinguishable because Torres testified that he did not know that the officers had parked their car behind him. This creates an interesting constitutional conundrum—can a seizure occur if an individual is physically blocked from leaving but erroneously believes that he can leave because he is unaware that he has been blocked? The parties' briefs, regrettably, fail to address this question. The court has been unable to find another case addressing this unusual fact pattern but finds guidance in longstanding Fourth Amendment precedent regarding seizures.

"[A]n officer's conduct may be unreasonable, unjustified, or outrageous, but it is not prohibited by the Fourth Amendment unless it involves a seizure." *Price v. Marion Cnty. Sheriff's Dep't*, No. 1:12-CV-408-RLY-DML, 2013 WL 5321260, at *5-6 (S.D. Ind. Sept. 23, 2013). Thus, the court's first task is to determine if the officers' conduct caused Torres to be seized. *See id*. Under "the so-called *Mendenhall* test, formulated by Justice Stewart's opinion in

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980) . . . . [a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Hodari D.*, 499 U.S. at 627-28 (quoting *Mendenhall*, 446 U.S. at 554). "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.*

The objective nature of the standard promotes "consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police." *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988). It "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment" and "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Id.* This line of cases suggests that the officers seized Torres because regardless of whether he knew his car was blocked into the carport, the officers knew that they had parked perpendicular to Torres' car so that he could not back out.

However, a "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (citing *Mendenhall*, 446 U.S. at 553); *Brower*, 489 U.S. at 599 (an actionable seizure occurs when a person is "stopped by the very instrumentality set in motion or put in place in order to achieve that result"). Thus, while the use of physical force (*i.e.*, force involving contact) "always constitutes a seizure, a 'show of authority' alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to

that authority." *Griffin*, 652 F.3d at 798 (citing *Hodari D*., 499 U.S. at 626); *Price*, 2013 WL 5321260, at *7. In other words, "a seizure by submission following a show of authority . . . does not occur *unless* and *until* the suspect submits." *Id*. at 800-01 (emphasis in original).

*Estate of Williams v. Indiana State Police* illustrates this principle. 26 F. Supp. 3d 824 (S.D. Ind. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015). In *Williams*, law enforcement officers arrived at Williams' home. He was locked in his bathroom and threatened to kill anyone who entered. The officers opened the bathroom door and attempted to subdue Williams with a Taser. He responded by advancing towards the officers holding a knife, at which point he was fatally shot. His estate contended that the officers seized Williams when they opened the bathroom door with Tasers and guns trained on him because "[t]his was a seizure by submission to a show of authority through passive acquiescence." *Id*. at 848.

The court noted, however, that no evidence showed that Williams acquiesced to the officers' show of authority when they opened the door as the officers deployed their Tasers almost immediately after they opened the door. Indeed, Williams' estate had argued that it was unreasonable for the officers to surprise Williams by opening the bathroom door and then immediately tase him without warning. Thus, the court concluded that Williams did not submit to the show of authority so "there [was] at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id*. (quoting *Brendlin*, 551 U.S. at 254).

Torres' situation is very similar. He testified that two men (two of the defendant officers, as things turned out) approached both sides of his car rapidly from the rear and that from his vantage point in his car, which was parked in a carport, he did not see the police car parked

behind him. The presence of the parked car behind Torres' car that would have prevented him from backing out of the carport if he had tried to do so—which is the plaintiffs' basis for claiming that a seizure occurred—thus played no role in the events on the night of October 1, 2010. The officers' decision to block Torres' car using their squad car is, therefore, at best an attempted seizure.[4] *See Brendlin*, 551 at 254 ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission."); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 n.7 (1998) (an attempt to effect a seizure does not implicate the Fourth Amendment); *Bridgewater v. City of Indianapolis*, No. 114CV01370JMSMJD, 2016 WL 1117646, at *8 (S.D. Ind. Mar. 22, 2016) (when the plaintiffs "stopped because the traffic light was red, refused to follow all instructions while there was interaction, and then fled after the light turned green," a seizure did not occur because the plaintiffs did not submit to a show of authority).

---

[4] In closing arguments, plaintiff's counsel referred to the location of the officers's squad car and Pena's awareness that Torres was blocked into the carport:

> You heard from Eligio, what happened. When he got into the car, the first thing that happens is, these two guys are on both sides of the car. "Don't move, motherfucker." He's terrified. What does that sound like? It sounds like a possible mugging, carjacking, robbers. This could be a robbery. He reaches for his phone instinctively to call the police. The phone is smacked out of his hands. That was their choice how to start this investigation. And at that point, Peña admitted, he's blocked in. He parked his car so he can't drive away. Choices and consequences. He's now trapped in that spot. He can't drive away. He's trapped in the car. They smack the phone out of his hands and immediately cuff him to the steering wheel.

(Dec. 17, 2015 Tr. at 222.) This is an accurate recitation of the evidence and illustrates the plaintiffs' position during trial, as the officers knew they had blocked Torres in, but Torres testified that he did not see a car behind him. However, as discussed in the text, Pena's knowledge, by itself, does not control if a seizure occurred.

Accordingly, the placement of the officers' car did not rise to the level of a seizure because regardless of the officers' objective beliefs, there was no submission. Thus, there is no basis for revisiting the jury's verdict. The plaintiffs' motion for judgment as a matter of law is denied.

### D.    Pena's Request for Judgment as a Matter of Law

Pena argues that he is entitled to judgment as a matter of law as to the plaintiffs' malicious prosecution claims because no reasonable jury could have found that: (1) he lacked probable cause to arrest and charge Correa with aggravated battery; (2) he lacked probable cause to arrest and charge Torres with aggravated battery; or (3) he acted maliciously in commencing the prosecution of the plaintiffs.

### 1.    Probable Cause to Arrest and Charge Correa with Aggravated Battery

Probable cause is "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *14 (N.D. Ill. May 17, 2016) (quoting *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013)). It turns on the state of mind of the person who commences a prosecution, not "the actual facts of the case or the guilt or innocence of the accused." *Williams*, 733 F.3d at 759 (quoting *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 574 (1st Dist. 2006)). The existence of probable cause is a complete defense to a malicious prosecution claim. *See, e.g.*, *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001).

Pena argues that probable cause supported his decision to arrest Correa for aggravated battery to a police officer because he "had an honest and sound suspicion that Correa knew he

was a peace officer" when she hit him, regardless of Correa's subjective belief that Pena was not a police officer.[5]  (Dkt. 153 at 4.)  According to Pena, "[n]o reasonable jury could have found [his] belief as to Plaintiff's Correa's knowledge of his office to be less than honest or strong, even if mistaken, and Plaintiff points to no evidence before the jury that could possibly support such a finding."  (Dkt. 181 at 4.)

Pena's professed personal belief about what Correa knew, however, is contradicted by Correa's testimony that she pushed Pena in his back and that from this vantage point, she could not tell that he was a police officer.  Correa also testified that she realized that Pena was a police officer when he turned around and she saw his vest.  Terri Wilson, a neighbor who saw the push, testified consistently that she saw Correa push Pena from behind and heard Correa state, after Pena turned around and punched Correa in the mouth, that she had not realized Pena was a police officer.

In the context of a motion for judgment as a matter of law, the court must draw all reasonable inferences in favor of Correa and cannot assess credibility or reweigh the evidence. *Reeves*, 530 U.S. at 150.  A rational jury could have believed Correa's testimony—which was supported by Wilson's testimony— that she approached Pena from the back and from that perspective, could not tell that he was a police officer.  Pena's argument flies in the face of the standard governing motions for judgment as a matter of law because the jury easily could have accepted Correa and Wilson's testimony as true.  At that point, Pena's professed belief that it

---

[5]  Pena also baldly asserts that if the court finds that probable cause did not support his decision to charge Correa with aggravated battery to a police officer, it should find that he is entitled to qualified immunity as to her malicious prosecution claim.  (Dkt. 153 at 2.)  A throwaway reference to qualified immunity is insufficient.  Any such argument is waived.  *See, e.g.*, *Johnson*, 2016 WL 3476660, at *6.

was reasonable for him to think that Correa knew he was a police officer is unreasonable. *See Edwards v. Haritos*, No. 09 C 1726, 2012 WL 774531, at *2 (N.D. Ill. Mar. 8, 2012) (denying a motion for judgment as a matter of law because the "defendants overlook . . . that a jury need not believe the defendants' own testimony about their state of mind, but may infer the defendants' state of mind from other evidence," including the plaintiffs' version of events). This portion of Pena's motion is denied.

### 2. Probable Cause to Arrest and Charge Torres with Aggravated Battery

The parties dispute whether Torres kicked Pena in the leg or inadvertently touched Pena in a glancing fashion when Torres exited his car on the night of his arrest. Pena argues that he had "a reasonable objective belief that Torres committed the offense of aggravated battery to a police officer regardless of Torres' subjective belief that any physical contact was not intentional" and that the court can evaluate his "objective reasonable belief" without "consider[ing] Torres' subjective state of mind." (Dkt. 153 at 5.)

This argument suffers from the same defect as Pena's probable cause arguments about Correa. At trial, the parties presented competing versions of the events in the carport. The court must draw all reasonable inferences in favor of Torres; it cannot, as Pena seems to suggest, simply accept Pena's contradictory version of events. Torres' position that he did not make knowing contact with Pena is supported by his testimony. If the jury accepted this testimony, it would necessarily have rejected the defendants' countervailing evidence. This portion of Pena's motion is denied.

### 3.      Malice

Next, Pena argues that no reasonable jury could have found that he acted maliciously in commencing the prosecution of the plaintiffs.  Specifically, according to Pena:

> In this case the plaintiffs themselves admitted to striking [him].  While they may have argued justification or explained why they struck him the fact remains that they struck him.  Given the requirements for a probable cause analysis, and the testimony of Defendant Pena, one must conclude that Defendant Pena obviously had probable cause to arrest both Torres and Correa.  Further, this Court has heard all the evidence.  But for the inflamed emotions of the jury, there is simply no way a jury could find that Defendant Pena acted with malice.  He charged crimes he thought were appropriate.  Neither he nor any other officer at the scene was hurt badly.  They had no prior relationship or knowledge of plaintiffs.  Thus, it stands to reason, that he had no reason to act with malice and charge plaintiff's [sic] with a crime he felt they did not commit.

(Dkt. 153 at 7.)

The "malice" element of malicious prosecution exists when the "the officer who initiated the proceedings was motivated by something other than a desire to bring a guilty party to justice."  *Seiser v. City of Chicago*, 762 F.3d 647, 659 (7th Cir. 2014).  Under Illinois law, "[i]t is well established that a jury can infer malice from an absence of probable cause."  *Williams v. City of Chicago*, 733 F.3d 749, 760 (7th Cir. 2013) (collecting cases).  Once again, the court cannot elect to accept Pena's version of events at this stage of the proceedings, no matter how vigorously he asserts that the jury's adverse verdict is not supported by the evidence and must be a result of "inflamed emotions."[6]  As discussed above, the evidence presented at trial was sufficient for the jury to conclude that Pena lacked probable cause for the charges he instituted

---

[6] The court is not persuaded by the defendants' argument that negative press coverage of the use of force by police necessarily inflamed the jury.  All that the defendants offer in support is their ipse dixit, as they do not point to anything specific that supports their suggested inference or challenge any portion of the voir dire.  *See Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 868 (E.D. Wis. 2015) (rejecting the defendants' claim that media bias influenced the jury).

against Torres and Correa. This supports an inference that Pena acted based on malice rather than a desire to bring a guilty party to justice. *See Anderson v. Landrum*, No. 12 C 1902, 2015 WL 1538243, at *6 (N.D. Ill. Mar. 31, 2015) (declining to disturb a verdict after the parties presented "significantly divergent facts" at trial because a reasonable jury could question if probable cause existed).

As discussed above, a rational jury could have accepted the plaintiffs' evidence that Correa did not realize that Pena was a police officer when she initially saw him from behind and pushed him, thinking he was a mugger intent on attacking her then-boyfriend. It also could have accepted Torres' testimony about the kick. Given that, it could then have questioned Pena's basis for bringing felony aggravated battery charges against Torres and Correa because the plaintiffs' version of events is inconsistent with Pena's good faith in bringing aggravated battery charges. *See Edwards*, 2012 WL 774531, at *2 (if the jury believed the plaintiffs' testimony about their encounter with the police, they could have concluded that the officers "had fabricated their story to create probable cause when there was none previously" and thus lacked good faith in bringing charges against the plaintiffs). This portion of Pena's motion is denied.

### III. DEFENDANT PENA'S REMAINING POST-TRIAL MOTIONS

Besides the motion for judgment as a matter of law discussed above, Pena has filed alternative motions for a new trial, to alter judgment, to amend the judgment, and for remittitur.

### A. Pena's Motion for a New Trial as to the Plaintiffs' Malicious Prosecution Claims

In his motion for a new trial, Pena argues that: (1) the court erred in granting the plaintiffs' motion in limine to bar evidence regarding Torres' possession of cocaine and ultimate conviction for possession of a controlled substance on the night of his arrest; (2) the court erred

in rejecting the defendants' contention that Torres opened the door to admission of the cocaine evidence during trial; (3) the court erred in prohibiting Pena from testifying about his understanding of the process of bringing state criminal charges; (4) plaintiffs' counsels' purported violations of rulings on motions in limine during closing argument unfairly prejudiced him; (5) the court gave erroneous jury instructions regarding compensatory damages and the definition of aggravated battery; and (6) the court erred when it excluded Rule 609 evidence regarding Torres' 2006 felony conviction.

### 1.      Legal Standard

"The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:  (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . "  Fed. R. Civ. P. 59(a)(1).  A new trial is proper if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party.  *See Whitehead v. Bond*, 680 F.3d 919, 927-28 (7th Cir. 2012).  A party seeking a new trial under Rule 59 "bear[s] a particularly heavy burden because a court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict."  *Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 314 (7th Cir. 2011) (internal quotations omitted).  If a party alleges that the court erred by admitting or excluding evidence, the court must consider its evidentiary ruling in the context of the entire trial record.  *Anderson*, 2015 WL 1538243, at *6 (citing *Barber v. City of Chicago*, 725 F.3d 702, 705 (7th Cir. 2013)).

2.     **Torres' Conviction for Possession of Cocaine**

Pena raises two related arguments regarding Torres' possession of cocaine on the night of his arrest:  (1) the court's pretrial ruling barring evidence regarding Torres' possession of cocaine on the night of his arrest and his subsequent conviction for possession of cocaine was erroneous; (2) the court erred in keeping this evidence out after Torres purportedly opened the door to its admission during trial.  These evidentiary dispute originates in the fact that the officers found a small quantity of cocaine on Torres' person when they searched him later in the evening on the night of his arrest, when he was lying handcuffed on the ground.

a.     **In Limine Ruling**

First, Pena challenges the court's in limine ruling excluding this evidence.  Pena contends that the ruling was erroneous because it was "critical to the jury's determination of the compensatory damages" that Torres suffered in connection with his malicious prosecution claim and his request for associated punitive damages.  (Dkt. 153 at 8.)  Pena's theory is that Torres would have gone to trial on the cocaine possession charge and spent time in custody even if he had not been prosecuted for battery to a police officer so "the fact of Torres' cocaine possession and the fact that he was found guilty of that possession in the same trial in which he was found not guilty of aggravated battery is extremely probative as to the damages Torres should have been able to recover on his malicious prosecution claim."  (*Id*. at 9.)

Pena's summary of the court's in limine ruling as to this issue is flagrantly inaccurate.  In their response to the plaintiffs' motion in limine, the defendants argued that evidence about the later-discovered cocaine was relevant because it provided a plausible explanation for the officers' version of events—Torres was reaching his hands around inside his vehicle because he

knew the police were approaching and wanted to hide his cocaine. The court held that the officers' position that Torres quickly and repeatedly reached towards multiple areas inside his car in a manner that was visible to someone outside the car (*e.g.*, towards the dashboard, among other places) did not tend to make it more likely that the officers' testimony about Torres' hand movement was true because the officers' description of Torres' behavior was inconsistent with the actions of an individual who was attempting to hide drugs:

> There are few certainties in life, but common sense says that an individual who wants to hide drugs while police are standing near both sides of his parked car will not quickly and repeatedly reach out with his hands towards multiple locations inside his car in an "agitated" and "irate" way that is visible from outside the car, as if as if he was trying to find something. The court does not understand how possession of drugs makes it more likely that the officers' testimony about Torres' hand movements is true. If anything, the alleged desire to hide drugs makes it less likely that the officers' testimony about agitated, repetitive reaching to multiple areas of the car is true.

(Dkt. 117 at 7.) The court then concluded that to the extent the evidence had any probative value (which had not been established), that value would be substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.

With respect to the admissibility of the cocaine in the context of Torres' malicious prosecution claim, the court held that:

> If the officers had not allegedly violated Torres' rights in the first place, Torres would not have been charged with aggravated battery and searched. No evidence suggests that without the seizure, Torres still would have been searched. Indeed, such a conclusion is at odds with the officers' deposition testimony, as they both testified that they decided to question Torres due to his location near the alleged shooter's last known address but that he was not otherwise engaging in suspicious activity. The defendants' arguments about damages are thus unconvincing.

(*Id*. at 9.)

Today, Pena argues (in a confusing way) that the court:

> put the cart before the horse in assuming a constitutional violation as a basis to exclude Plaintiff Torres' conviction for possession. However, even assuming that the above logic in excluding Plaintiff Torres' conviction was correct, this Court did not contemplate the result reached by the jury here, that there would be liability for the malicious prosecution claim without a finding that Plaintiff Torres' constitution [sic] rights were violated. Thus, even by this Court's reasoning, because the jury did not find an unconstitutional search and seizure of Plaintiff Torres, this Court's decision to exclude Plaintiff Torres' possession of cocaine conviction was incorrect and prejudicial to the Defendants [sic] defense.

(Dkt. 153 at 12.)

In the order addressing most of the parties' motions in limine, the court did not, as the defendants argue, assume that the defendants had violated Torres' constitutional rights. Instead, the court made the commonsense statement that "[n]o evidence suggests that without the seizure, Torres still would have been searched." Thus, it held that, "If the officers had not *allegedly* violated Torres' rights in the first place, Torres would not have been charged with aggravated battery and searched." (Dkt. 117 at 9) (emphasis added.) In other words, nothing in the record suggests that had the officers encountered Torres on the night in question without hearing the flash message about Corey Campbell, they would have had a basis to search him and would have, therefore, discovered the cocaine.

Turning to the merits of the defendants' argument about the cocaine possession evidence, the jury's verdict on Torres' malicious prosecution claim is consistent with its verdict in favor of the defendants on Torres' Fourth Amendment claim.[7] Given its ruling on Torres' malicious

---

[7] Pena's post-trial motion stresses that the court did not contemplate the result reached by the jury (a verdict in Torres' favor on the malicious prosecution claim and in the officers' favor on the excessive force claim). However, he does not identify any portion of the pretrial or trial record explicating an argument based on this theory. He also does not explain how he knows what the court contemplated or what evidence, if any, supports his view of what he thinks

prosecution claim, the jury must have found that Pena lied when he testified that Torres

committed aggravated battery to a police officer (*i.e.*, Pena's testimony about an intentional kick

was untruthful because the kick was glancing and inadvertent).  The jury must have also have

accepted that overall, the officers' use of force was not excessive given other evidence of Torres'

actions during the encounter.  Thus, the purported inconsistency at the heart of Pena's motion

does not exist.

Evidence supports both of these findings, and the jury was entitled to reject the

defendants' countervailing evidence.  Moreover, as the reader may recall, after a state court jury

trial, Torres was found guilty of possession but not guilty of aggravated battery.  The aggravated

battery charge (a Class Two felony with a potential sentence of three to seven years in custody)

turned on disputed facts and the state court jury, like Torres' federal jury, sided with Torres.

However, if Torres had faced a cocaine possession charge alone (a Class Four felony with the

option of probation and a sentencing range of one to three years in custody) he may well have

pleaded guilty to that charge.  This would have obviated the need for a time-consuming and

expensive trial.

It is unclear what would have happened absent the aggravated battery charge.  *See*

*generally Barber v. City of Chicago*, 725 F.3d 702, 713 (7th Cir. 2013) ("[T]here is a difference

between being falsely arrested on one occasion and being rightfully arrested (and rightfully

convicted) on another occasion.  It is possible for a person to be traumatized by being falsely

hauled off to jail and incarcerated, while accepting responsibility for his other misdeeds that

result in even longer, lawful incarceration.").  However, this court is not in the business of

---

the court contemplated.

revisionist history.  It is not persuaded by Pena's present arguments about damages.  In any event, the court adheres to its belief that to the extent that the cocaine evidence has any probative value, that value would be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, and misleading the jury."  Fed. R. Evid. 403.  This portion of Pena's motion is denied.

### b.      Did the Plaintiffs Open the Door During Trial?

The court next considers the related argument that it erred in excluding the cocaine evidence after Torres purportedly opened the door to admission of that evidence during trial.

### i.      References to Towing and Impoundment

First, Pena contends that the plaintiffs opened the door when they "intimated" that Torres' car was towed and impounded for no reason, preventing him from picking up his son. (Dkt. 153 at 13.)  This argument is based on the fact that, in response to questions by plaintiffs' counsel, Romero testified that Torres' car was towed and Pena testified that he prepared a "vehicle impound" report because Torres' car had been impounded.  (Dec. 15, 2015 Tr. at 95; Dec. 17, 2015 Tr. at 29.)  When the defendants subsequently challenged this testimony outside the presence of the jury, the court noted that the defendants had not made contemporaneous objections.  (*Id*. at 155.)         Following a discussion of the testimony, the court stated, "If you want to tell the jury that when someone is arrested—and the officer has testified that [Torres] was arrested for an assault on an officer.  If you want to tell them that the car, towing a car is ordinary when that happens, I don't have any problem with that."  (*Id*. at 160.)  This interchange followed:

Mr. Schumann:        But that's not true.

| The Court: | Well, then you won't tell it. |
|---|---|
| Mr. Schumann: | What's true is, the car was towed— |
| the Court: | If you're so scrupulous, we won't tell them. |

(*Id*.)

This issue came up again at the instructions conference, when the court stated, "I don't think that the jury would think [that towing and impounding was an unusual event that reflected negatively upon the officers], but if the defense is concerned about it, I don't know why we can't have it. I've been telling the defense we can have an instruction that takes that out of the jury's consideration." (Dec.16, 2015 Tr. at 34.) Plaintiffs' counsel suggested, "Why can't we just say plaintiff is not bringing any claims related to the vehicle or the parties stipulate that this is routinely done . . . " (*Id*. at 35.) The court rejected this suggestion, explaining, "The defendants didn't want to do it . . . . That's an easy fix, but the defendants were offended because it isn't true." (*Id*. at 36.) The court ultimately gave the following instruction, "You have heard testimony that Mr. Torres's automobile was searched, towed, and impounded by the Chicago Police Department. You are not to consider this evidence in determining liability on any of the plaintiff's claims or determining the amount of damages to award, if any." (Dec. 18, 2015 Tr. at 24.)

Thus, to the extent that the reference to the towing and impoundment of Torres' car was improper, the court gave a curative instruction. "[J]urors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) (citation and internal quotation marks omitted). To rebut the

presumption that they did not do so, the court must consider if "there is an 'overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating' to the moving party." *See Idris v. Conway*, No. 12 C 6271, 2015 WL 5139403, at *3 (N.D. Ill. Aug. 31, 2015) (quoting *United States v. Humphrey*, 34 F.3d 551, 556-57 (7th Cir. 1994).

Assessing whether any prejudice was alleviated turns on the "timeliness and effectiveness of the curative instruction as well as the record as a whole." *Id*. Despite the defendants' hyperbolic post-trial arguments, given the context in which the references to towing and impoundment were made and the non-central nature of this evidence, there is no reason to think that the jury was unable to follow the curative instruction.

### ii. The Cost of Defending Torres' State Criminal Case

Second, the defendants argue that Torres opened the door to admission of the cocaine possession evidence by referring to the cost of defending his state criminal case. The court has reviewed the transcript citations provided by the parties (here, the defendants both cited to and quoted from the transcript). When plaintiffs' counsel questioned Torres about the criminal case, counsel neither introduced evidence regarding his criminal defense fees nor asked the jury to award damages for those fees. Correa, however, testified that she spent $6,000 to retain a criminal defense attorney to defend against the aggravated battery charges against her. The defendants assert that this leads to "no other conclusion than that Plaintiff Torres incurred attorneys [sic] fees solely for having to defend against the aggravated battery charge." (Dkt. 181 at 10.) This is a highly biased view of Correa's testimony. This portion of the defendants' motion is denied.

### 3. Testimony about the Charging Process

Prior to trial, the defendants listed Assistant State's Attorney Del Castillo as a "may call" witness.  The plaintiffs sought to bar Del Castillo from testifying about his decision to approve felony aggravated battery charges against Torres and Correa.  Pena now argues that he should have been allowed to testify about the charging process.  Although Pena's argument includes exclamation points (a lack of relevancy "could not be further than the truth!")  (Dkt. 153 at 17), it is otherwise undeveloped and thus is waived.  It is also waived for a second reason:  the defendants did not respond to the motion in limine seeking to bar Del Castillo, although the court afforded them an opportunity to do so.  (Dkt. 131 at 2.)  Moreover, the defendants' present motion fails to engage with the substance of the court's December 10, 2015 order addressing this evidence.  (*Id*. at 2-3.)  This portion of Pena's motion is denied.

### 4. Closing Arguments

Four rulings on motions in limine filed by the defendants (3, 7, 11 and 13) underlie the defendants' argument that comments made by plaintiffs' counsel during closing arguments entitle them to a new trial.  The court barred the plaintiffs from making generalized allegations about a police "code of silence" or an alleged pattern and practice by law enforcement officers of remaining silent or seeking to cover up misconduct to protect fellow officers, but allowed the plaintiffs to present evidence and argue that the defendants officers attempted to cover up their allegedly unconstitutional actions on the night in question.  Next, the court barred evidence and argument regarding unrelated allegations of police misconduct in the media, holding that evidence of police conduct unrelated to the defendants in this case had minimal probative value but was highly inflammatory and prejudicial.  In addition, the court barred the use the word

"conspiracy," as well as any evidence or argument that all police officers (as opposed to the specific officers in this case) try to cover up misconduct to protect their fellow officers.

The plaintiffs take issue with the defendants' contention that their counsel made certain statements, asserting that they did not do so. The court will consider only challenges to statements made by plaintiffs' counsel that are accompanied by citations to the transcript. The court turns to those statements, which fall into two groups: one statement that was the subject of an objection and three statements made without objection.

### a. The Statement That Was the Subject of an Objection

The defendants seek a new trial based on a statement made during the plaintiffs' rebuttal closing argument. Specifically, the defendants challenge plaintiffs' counsel's reference to the Chicago Police Department's "Code of Silence." The defendants objected to this statement as follows:

| | |
|---|---|
| Mr. Jackowiak: | According to Officer Peña, running the plate on that car would have been not helpful to the investigation. Are you kidding me? The plate comes back Corey Campbell, that guy is going to get arrested. How could that not be helpful? That's the kind of thing that makes you wonder if you heard right. Officer Peña said running that plate wouldn't benefit the investigation. It's ridiculous. That's just part of the [testilying], the Chicago Police culture, code of silence, lies— |
| Mr. Schumann: | Judge, I'm going to object to that. |
| Mr. Jackowiak: | —covering— |
| Mr. Battle: | Objection. |
| The Court: | First of all, one person objects, not two. It's sustained. |
| Mr. Schumann: | Can we have a sidebar, please? |
| The Court: | It's sustained. |

| Mr. Schumann: | Can the jury be instructed? It's part of a motion in limine. |
|---|---|
| The Court: | [To the jury] Disregard that, what counsel just said about— [to defense counsel] well, I don't want to go over it again, but you know what I'm talking about. Do you want me to go over it again? |
| Mr. Battle: | Go ahead, your Honor. I think the jury knows what. |

(Dec. 17, 2015 Tr. at 226-27.)

The plaintiffs defend the comment by saying that it did not clearly violate the court's in limine order as that ruling barred generalized references to a "Code of Silence," as opposed to arguments that the defendant officers were trying to cover for each other. Close study of the comment shows that it appears to reference a generalized "Code of Silence" that purportedly causes all Chicago police officers to be untruthful, causing Pena to be untruthful with respect to Torres. Thus, the comment appears to refer impermissibly to a generalized "Code of Silence."

The court gave a prompt curative instruction by immediately directing the jury to disregard the comment. It also gave defense counsel an opportunity to "go over it again" with the jury, which counsel rejected by saying, "Go ahead, your Honor. I think the jury knows what." (Dec. 17, 2015 Tr. at 227.) Immediately following the comment, the court did not consider whether a second and more detailed curative instruction was necessary because defense counsel advised the court that this was unnecessary.

However, the following day, outside the presence of the jury, defense counsel raised this issue again by asserting that the court's "admonishment is not a curative instruction" and moving for a mistrial. (Dec. 18, 2016 Tr. at 9-10.) The court denied the defendants' motion, stating, "I'm going to deny the motion for a mistrial. I think I did enough curatively at the moment." (*Id.* at 10.) The court is not inclined to revisit this conclusion. Jurors are presumed to follow

curative instructions. *Danford*, 435 F.3d at 687. The defendants vigorously argue that the comment was responsible for the adverse malicious prosecution verdict given the current climate regarding force used by police officers in Chicago and elsewhere. The court, however, gave a timely and clear curative instruction. *See Idris*, 2015 WL 5139403, at *3

Moreover, the record as a whole indicates that any prejudice was alleviated because the jury clearly did not treat all officers alike given the split verdict on the plaintiffs' constitutional and malicious prosecution claims, as well as Pena versus the other defendant officers. The court must give all portions of the verdict—both those adverse to and favoring the defense—deference, as the jury was entitled to make its own credibility determinations. While Pena's post-trial brief presupposes that the jury was inflamed against him, the mixed verdict show that this was not the case. Thus, while the court does not condone the plaintiffs' reference to a "Code of Silence," Pena has failed to establish that the comment substantially prejudiced him. This portion of Pena's motion is denied.

### b. The Statements Made Without Objection

The defendants seek a new trial based on the following three statements in Mr. Jackowiak's rebuttal closing that relate to the in limine ruling regarding the Code of Silence:

- "[T]his was a classic case of the police [testilying]."[8] (Dec. 17, 2015 Tr. at 222.)

- "And then what happened after that? Very credibly, you heard from numerous witnesses, Eligio, Irene, and Terri, the honking, the screaming, somebody in despair, help. Her heart stops. She's a couple houses down across the alley. She hears that. Her—and then she recognized her boyfriend. Her heart stops. And they tried to make these guys to be heroes? Here's the real hero, ladies and

---

[8] The slang word "testilying" erroneously appears throughout the transcript as "test the line."

gentlemen. She saw these guys dressed in black, looked like muggers, sounds like a carjacking, and she runs up to try to save him. Heroic." *(Id.* at 229.)

- "This is not a case whether you're against the police or for the police. And really, nobody should be against the police, whatever that means. It's a dangerous world. We all need . . . police officers on the street, and we should all be appreciative of their service. But I wouldn't want to live in a city anywhere where the police knew that if they stepped over the line, they won't be held accountable. And today, that is your job, and your responsibility is enormous because today, you stand as a safety to our constitutional rights and our freedom. And without that, we'd all be in a lot of trouble, and a society where police officers know that when they step over the line, when they're wrong, when they do what happened in this case, they will be held accountable is a better place, a safer place, and a place we all have a right to live in." *(Id.* at 237.)

Without the benefit of any citation to authority, Pena denies that he waived his claims of prejudice by failing to make a contemporaneous objection. According to Pena, he "could not get a fair trial" because "[d]espite, the court's admonishment, the proverbial bell could not be un-rung. Defendants were in fear as the court pointed out, that further admonishment would have only illuminated the highly prejudicial statements of the plaintiffs to which defendants could not present any rebuttal argument." (Dkt. 181 at 16.)

The court did not "point[] out" any such thing. The defendants' habit of making this type of sweeping and unsupported statement does not advance their cause, as arguments that are not based on actual events that occurred during trial cannot form a basis for relief (and are not a productive use of the court's time). In any event, it is well established that the failure to make a contemporaneous objection to an argument that allegedly violates an in limine order results in forfeiture. *Thorncreek Apartments I, LLC v. Vill. of Park Forest*, No. 08 C 1225, 2015 WL 2444498, at *5 (N.D. Ill. May 20, 2015) (collecting cases). The defendants have pointed to no authority indicating that their attorneys' alleged reticence about objecting is an exception to the

contemporaneous objection rule.  Pena did not preserve this group of objections so this portion of his motion is denied.

### 5.    Jury Instructions

Next, Pena challenges the jury instructions regarding compensatory damages and the definition of aggravated battery.[9]  When considering challenges to jury instructions, the court has "substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law."  *Saathoff v. Davis*, — F.3d —, No. 15-3415, 2016 WL 3386780, at *5 (7th Cir. June 20, 2016) (quoting *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009).   The court must ask "if the correct message was conveyed to the jury reasonably well" by "examining the instructions as a whole, in a common sense manner, avoiding nitpicking.  If the instructions fail in this regard, a new trial is appropriate only if the instruction prejudiced the complaining party." *Id*. (citations omitted).

### a.    Compensatory Damages

The compensatory damages instruction provided that:

> If you find in favor of either or both Plaintiffs, then you must determine the amount of money that will fairly compensate each Plaintiff for any injury that you find he or she sustained and is reasonably certain to sustain in the future as a direct result of the Defendants' wrongful actions.  These are called "compensatory damages."

---

[9]  Pena also includes one-sentence objections about Torres' criminal defense fees and the order barring evidence relating to his conviction for possession of a controlled substance.  The motion does not allow the reader to glean how these criticisms relate to the jury instructions. The defendants' perfunctory presentation in their motion results in waiver.  *See*, *e.g.*, *Johnson*, 2016 WL 3476660, at *6.  Pena attempts to develop the attorneys' fee issue in reply, but this is too late.  *See*, *e.g.*, *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010).

Each Plaintiff must prove his or her damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages, and no others:

1. The reasonable value of the criminal defense fees incurred.

2. The emotional distress, physical pain and suffering and loss of a normal life that each Plaintiff has experienced and is reasonably certain to experience in the future. No evidence of the dollar value of emotional distress and physical pain and suffering or loss of a normal life has been or needs to be introduced. There is no exact standard for setting these damages. You are to determine an amount that will fairly compensate the Plaintiff for the injury he or she has sustained.

(Dkt. 140 at 30.) Pena takes issue with the inclusion of the value of the loss of normal life that plaintiffs are reasonably certain to experience in the future, as well as the reasonable value of the criminal defense fees that were reasonably necessary and that Torres incurred.

With respect to the loss of normal life, Pena asserts that the only evidence presented by the plaintiffs (1) "was their own highly speculative and self-serving testimony" about (2) past (not future) harm. (Dkt. 153 at 23.) First, the notion that the court can jettison the plaintiffs' testimony because it is self-serving is frivolous. *See*, *e.g.*, *Levi v. Bednarz*, No. 12-CV-3002, 2016 WL 3661098, at *2 (C.D. Ill. July 5, 2016) (citing *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)) ("When deciding whether a rational jury could have rendered the contested verdict, the Court views the evidence in the light most favorable to the non-moving party and does not make judgments as to the credibility or weight of the evidence presented."). The testimony of any witness is inherently self-serving, but this does not render it inadmissible. Pena

had ample opportunity to challenge the plaintiffs' testimony during cross-examination.  His

disagreement with the jury's verdict does not entitle him to a redo.  *See id.*

Second, as the court previously held in its in limine order, it is permissible for a lay

witness to testify about his "own perceptions, including the physical and emotional effects of the

defendants' alleged conduct."  *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 821 (N.D. Ill.

2010); *see also Watson v. Allen Cty. Sheriff's Officers*, No. 1:12-CV-55, 2013 WL 4540597, at

*4 (N.D. Ind. Aug. 27, 2013) (collecting cases and holding that a plaintiff "may testify about his

own perception of his physical and mental health, before and after the [encounter with police].

This includes recounting any pain, fear, or anxiety he experienced during those times.").  Third,

as with most of his other sweeping claims of error, Pena does not cite to any specific testimony

that allegedly tracks his contention that no evidence supports a finding of future harm, and the

court's recollection of the trial and its review of the transcript (including the instructions

conference, where this issue was discussed) does not support this contention.  *See* Dec. 16, 2015

Tr. at 18-20.

### b.    Aggravated Battery

Under Illinois law, a "person commits aggravated battery when, in committing a battery,

other than by discharge of a firearm, he or she knows the individual battered to be . . . . [a] peace

officer . . . (i) performing his or her official duties; (ii) battered to prevent performance of his or

her official duties; or (iii) battered in retaliation for performing his or her official duties."  720

Ill. Comp. Stat. § 5/12-3.05(d)(4).[10]  The aggravated battery statute does not expressly refer to

---

[10]  This is the current citation due to a renumbering of the criminal code.  In 2010, the
correct citation would have been 720 Ill. Comp. Stat. § 5/12-4.

legal justification. However, the Seventh Circuit has held that under Illinois law, "in order to be guilty of aggravated battery to a peace officer, [a plaintiff] must have (1) known that [the defendant officer] was a peace officer performing his official duties; and (2) intentionally or knowingly; (3) voluntarily; (4) without legal justification; (5) caused bodily harm to [the defendant officer]." *Tolliver v. City of Chicago*, 820 F.3d 237, 242 (7th Cir. 2016). The phrase "without legal justification" comes from the definition of the lesser offense of battery, which consists of "intentionally or knowingly without legal justification and by any means, (1) caus[ing] bodily harm to an individual or (2) mak[ing] physical contact of an insulting or provoking nature with an individual." *Id.* (quoting 720 Ill. Comp. Stat. § 5/12-3.3).

During the instructions conference, the defendants challenged the inclusion of the phrase "without legal justification." (Dec. 17, 2015 Tr. at 146.) The plaintiffs intimated that the aggravated battery statute contained the phrase "without legal justification":

> MS. YARUSSO: Here's the disagreement. The language that is different between what defendants have just now handed up and what plaintiff submitted, plaintiffs's first paragraph is identical except that our first paragraph has the words "without legal justification" after— in the second line, and theirs omits that. And ours tracks the criminal code exactly. And they just omitted those three words from the criminal code.
>
> THE COURT: And "without legal justification" is in the criminal code?
>
> MS. YARUSSO: Yes.
>
> THE COURT: And this is a definition of the criminal offense?
>
> MS. YARUSSO: Yes.
>
> THE COURT: Well, then I think it should be in there.

(Dec. 17, 2015 Tr. at 147.)

Thus, the court gave the following instruction regarding aggravated battery:

A person commits the criminal offense of aggravated battery to a police officer if he or she intentionally or knowingly without legal justification and by any means causes bodily harm to a police officer and he or she knows the individual harmed to be a police officer engaged in the performance of his authorized duties.

(Dec. 18, 2015 Tr. at 24.)

The defendants challenge this instruction, contending that the court should have given an instruction on the elements of standard, non-aggravated battery. As discussed above, the inclusion of the phrase "without legal justification" accurately reflects Illinois law. Moreover, leaving the jury to reconcile the definitions of battery and aggravated battery (to the extent that this would have been possible) would have introduced unnecessary confusion.

Last but not least, the plaintiffs brought a malicious prosecution claim based on the officers' decision to charge them with aggravated (not standard) battery. "In a malicious prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.'" *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *14 (N.D. Ill. May 17, 2016) (quoting *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). The "offense charged" was aggravated battery, not battery. Pena's arguments are unconvincing.

### 6.     Torres' 2006 Felony Conviction

Next, Pena argues that the court erred when it excluded Rule 609 evidence regarding Torres' 2006 felony conviction, which led to a sentence of probation. The court held that the defendants had waived this issue at the motion in limine stage by failing to respond to the plaintiffs' request to exclude this evidence. *See* Dkt. 117 at 11 ("The defendants champion the

admission of the cocaine possession conviction arising out of the 2010 incident underlying this case (which is not the subject of this motion in limine) and do not address the 2006 conviction. Thus, this motion in limine is granted.").  Despite this ruling, during the defendants' case-in-chief, the defendants sought to recall Torres (who had testified as part of the plaintiffs' case) so they could introduce evidence about the 2006 felony conviction.  (Dec. 16, 2015 Tr. at 39-44.) The court held that this tactic was improper, explaining:

> You're asking to do something bizarre, okay? . . . . [Y]ou're going to call the plaintiff for one simple purpose, to bring up a past conviction after he's already testified.  You had full opportunity to cross-examine him . . . . You can't lie in wait and not raise an issue when it's been presented to me and then, you know, in the middle of trial ask for the strange thing where you're going to recall a party for this limited purpose.

(*Id*. at 41-42.)

The court, however, cautioned the plaintiffs, "[D]on't get up there and argue that he's a choir boy and he's never been convicted of anything."  (*Id*. at 42)  Given Torres' deposition testimony, the court also rejected defense counsel's contention that the defense was surprised by Torres' testimony and could not react while Torres was on the stand, observing, "I don't understand why the defendants didn't try to cross-examine him, at least get me to change my opinion at a time when it would not have been so ridiculously prejudicial as it would be to call him just for this purpose at this point . . . . It's too little, too late."  (*Id*. at 43-44.)

Now, Pena asserts that the court should have allowed his counsel to question Torres about the 2006 felony conviction as part of the defense case and given a jury instruction about its consideration of this evidence.  In support, the defendants contend that despite their pretrial waiver, Torres opened the door to admission of his 2006 felony conviction due to his testimony about his role as a voluntary caregiver to his father and to neighbors, his emotional state due to

his eight or nine day stay as a detainee at Cook County Jail, his lack of recognition of police officers, his emotional state after the incident, and his alleged efforts to find comfort through religion. The court is not convinced that this testimony opened the door.

The main problem with this argument, however, is that the defendants should have challenged the court's in limine ruling outside the presence of the jury during their cross-examination of Torres. The in limine order placed the defendants on notice that they could do so, as it stated that, "All rulings on motions in limine are without prejudice to raising the issue at trial." (Dkt. 117.) If the defendants had challenged the exclusion of the 2006 felony conviction while Torres was on the stand, the court could have reconsidered its in limine ruling at the appropriate time.[11]

Pena's brief does not engage with the timing of his request to ask the court to revisit its ruling. Given the defendants' prior cross-examination of Torres and the extreme prejudice that would have resulted from calling him separately to testify about this subject, the court remains firmly convinced of the correctness of its decision not to allow the defendants to recall Torres as part of their case so they could question him about the 2006 conviction. This portion of Pena's motion is denied.

---

[11] The court's focus on the timing of the defendants' effort to introduce evidence about the 2006 felony conviction does not mean that it would have allowed the defendants to question Torres about this subject if defense counsel had presented argument about it while Torres was on the stand. The court expresses no opinion on this subject, as the defense did not develop their argument at the proper time and failed to respond to the plaintiffs' motion in limine seeking to exclude this evidence.

**B.  Pena's Motion to Alter or Amend the Judgment Pursuant to Rule 59(e)**

Finally, Pena seeks to alter or amend the judgment, contending that punitive damages are not available under the Illinois Governmental Tort Immunity Act.  Alternatively, he asks for remittitur, arguing that the jury's punitive damages award ($60,000 and $45,000 on the state law malicious prosecution claims brought by Torres and Correa, respectively) are "unwarranted and excessive."  (Dkt. 153 at 29.)

**1.  Legal Standard**

"The purpose of a motion to alter or amend judgment under Rule 59(e) is to ask the court to reconsider matters 'properly encompassed in a decision on the merits.'" *Wine & Canvas Dev. LLC v. Muylle*, No. 1:11-CV-01598-TWP, 2015 WL 6554686, at *1 (S.D. Ind. Oct. 28, 2015) (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989)).  To be entitled to relief under Rule 59(e), the movant must "clearly establish[] a manifest error of law or fact" or point to newly discovered evidence.  *Burritt v. Ditlefsen*, 807 F.3d 239, 253 (7th Cir. 2015).  A manifest error "is not demonstrated by the disappointment of the losing party.  It is the wholesale disregard, misapplication, or failure to recognize controlling precedent."  *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citation and quotation marks omitted).  Moreover, Rule 59(e) is not a vehicle to "advance arguments that could and should have been presented to the district court prior to the judgment" or to rehash previously rejected arguments.  *Peterson v. Vill. of Downers Grove*, No. 14 C 09851, 2016 WL 3538929, at *3 (N.D. Ill. June 29, 2016) (citations omitted).

### 2. The Illinois Governmental Tort Immunity Act

Pena seeks to alter or amend the judgment, contending that punitive damages as to the plaintiffs' state law malicious prosecution claims are not available under the Illinois Local Governmental and Governmental Employees Tort Immunity Act. The Act provides, in pertinent part, that:

> Notwithstanding any other provision of law, a local public entity is not liable to pay punitive or exemplary damages in any action brought directly or indirectly against it by the injured party or a third party. In addition, no public official is liable to pay punitive or exemplary damages in any action arising out of an act or omission made by the public official while serving in an official executive, legislative, quasi-legislative or quasi-judicial capacity, brought directly or indirectly against him by the injured party or a third party.

745 Ill. Comp. Stat. § 10/2-102. Pena's post-trial motion appears to be the first time that he has asserted immunity based on the Illinois Governmental Tort Immunity Act.[12]

Immunity based on the Illinois Governmental Tort Immunity Act is an affirmative defense that must be raised in the answer. *Gray v. United States*, No. 11-CV-4261, 2013 WL 4506778, at *2 n.2 (N.D. Ill. Aug. 22, 2013). It is well established that a defendant must plead its affirmative defenses in its answer to the complaint. *Venters v. City of Delphi*, 123 F.3d 956,

---

[12] A search of the docket prior to the post-trial motions reveals that the plaintiffs' amended complaint sought relief under the Governmental Tort Immunity Act as the plaintiffs alleged that, "Pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/9-102, Defendant CITY OF CHICAGO is liable for any judgments for compensatory damages in this case arising from the Defendant-Officers' actions." (Dkt. 32 at ¶ 77.) In their answer, the defendants stated, "The allegations in Paragraph 77 state a legal conclusion and therefore no answer is required. To the extent an answer is required, Defendants deny all the allegations contained in this paragraph. Defendants specifically deny any wrongdoing by any Chicago Police Officers and deny that Plaintiffs are entitled to any relief against any defendant." (Dkt. 33 at ¶ 77.) The defendants' answer included affirmative defenses of qualified immunity, failure to mitigate, comparative fault, collateral estoppel, the City's lack of liability if its employees or agents are not liable, and the City's lack of liability for injuries "caused by the act or omission of another person." (*Id.* at PageID #102-03.)

967 (7th Cir. 1997). This avoids "surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to demonstrate why the defense should not prevail." *Id*.; *Siemens Transformadores S.A. de C.V. v. Soo Line R. Co.*, No. 10 C 3750, 2012 WL 774937, at *4 (N.D. Ill. Mar. 7, 2012). The court may allow a defendant to amend its answer to add an affirmative defense when the defendant acts "in a timely fashion" and "[t]he pertinence of a particular defense" is not "reasonably apparent." *Venters*, 123 F.3d at 967-68. It should not, however, allow a defendant to "ambush a plaintiff with an unexpected defense." *Id*. (internal quotations omitted).

This is precisely what the defendants are trying to do. It is unclear why Pena elected to raise this issue for the first time in a post-trial motion. Courts have rejected far less untimely attempts to rely on the Illinois Governmental Tort Immunity Act. *See Gray*, 2013 WL 4506778, at *2 n.2 (granting a motion in limine seeking an order barring references to the Illinois Governmental Tort Immunity Act because the defendants' failure to raise immunity as an affirmative defense resulted in waiver); *Niebur v. Town of Cicero*, 212 F. Supp. 2d 790, 819-20 (N.D. Ill. 2002) (declining to instruct the jury regarding the Governmental Tort Immunity Act because this defense was first raised when the defendants submitted jury instructions and the availability of this defense was "reasonably apparent long before the beginning of trial").

Here, the jury—as did the court—thought that punitive damages were available in connection with the plaintiffs' malicious prosecution claim. The defendants are trying to have it both ways by staying silent pre-verdict regarding the potential for immunity pursuant to the Illinois Governmental Tort Immunity Act and then claiming immunity following an adverse verdict. It would be fundamentally unfair to pull the rug out from under the plaintiffs after the

jury awarded punitive damages (assuming that the court agrees that the Act applies here, an issue that it need not reach) by considering the defendants' current arguments about immunity.

The plaintiffs, however, do not raise waiver in their response to Pena's motion. A party can waive a waiver argument based on the Illinois Governmental Tort Immunity Act. *See*, *e.g.*, *Ebrahime v. Dart*, No. 09 C 1534, 2012 WL 33053, at *12 (N.D. Ill. Jan. 6, 2012). The court may nevertheless exercise its discretion and overlook a waiver. *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1043 n.10 (N.D. Ill. 2014); *see also JMB Mfg., Inc. v. Child Craft, LLC*, No. 4:11-CV-0065-TWP- WGH, 2012 WL 1326158, at *3 (S.D. Ind. Apr. 17, 2012) (collecting cases). The court's general preference is to reach the merits when possible. But given the waiver by both sides and the obvious serious prejudice that would flow from the interjection of potential immunity into this case at this stage of the proceedings, the court, in an exercise of its discretion, elects to hold the defendants to their waiver. Having provided no explanation for the untimely invocation of the Illinois Governmental Tort Immunity Act, let alone a persuasive one, the court declines to consider whether Pena is entitled to immunity.

Pena previously challenged a single part of the punitive damages instruction: the omission of language addressing the defendant officers' financial condition. *See* Defendants' Proposed Jury Instruction No. 30. However, defense counsel withdrew this objection when the parties agreed that they would not make any arguments about the defendant officers' financial condition. (Dec. 16, 2015 Tr. at 28.) How defense counsel thinks that the court could apply immunity now without seriously and unfairly prejudicing the plaintiffs is a mystery. The issue was waived and revisiting it now would cause severe prejudice

The court bears the ultimate responsibility for ensuring that instructions are correct. *See Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 642 (7th Cir. 2011). It cannot, however, act as an advocate for a party to find arguments (such as the affirmative defense of immunity) that a party has omitted. Pena provides no authority suggesting that a post-trial motion is an appropriate time to argue, for the first time, that he is immune from an award of punitive damages and, as discussed above, allowing him to proceed with his immunity argument now (assuming that it is meritorious, an issue which the court need not reach) would work serious prejudice on the plaintiffs. Pena's unsupported and untimely request to vacate the entire punitive damages award is denied.

### 3. Remittitur

As noted above, the jury awarded $40,000 and $$30,000 in compensatory damages to Torres and Correa, respectively, on their state law malicious prosecution claims, and $60,000 and $45,000 in punitive damages against Pena as to these claims. Pena asks the court to vacate the punitive damages award because "he cannot be assessed punitive damages on a state law claim for malicious prosecution." (Dkt. 153 at 36.) Alternatively, he asks the court "to reduce the award to zero because punitive damages were unwarranted, excessive, and the result of an inflamed jury." (*Id.*)

### a. Availability of Punitive Damages

The remittitur portion of Pena's brief contains terse and conclusory assertions that punitive damages are completely unavailable, presumably based on the Illinois Governmental Tort Immunity Act. As discussed above, this argument is way too late and, at least for that reason, unavailing.

### b. Should the Punitive Damages Award be Set Aside or Reduced?

### i. Legal Standard

"A federal court, in reviewing the amount of punitive damages awarded on a state law claim, must apply state law" but "federal constitutional standards also are implicated." *Hammer v. Residential Credit Solutions, Inc.*, No. 13 C 6397, 2015 WL 7776807, at *45 (N.D. Ill. Dec. 3, 2015) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430-31 (1996)). Thus, the Supreme Court has held that:

> In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude, requiring only that the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence. Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (citation omitted).

With respect to the state standard, Illinois does not limit punitive damages to a specific proportion of compensatory damages. *Hammer*, 2015 WL 7776807, at *45 (citing *Blount v. Stroud*, 915 N.E.2d 925, 940 (Ill. App. Ct. 2009)). Instead, after the court determines that punitive damages are available, "it is for the jury to decide based on the evidence presented whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages" and, if so, to assess the amount of punitive damages. *Blount*, 915 N.E.2d at 939. In reviewing the jury's punitive damages award, the court must conduct a case-specific assessment, focusing on the purpose of punitive damages—to punish and deter—as well as "the nature and enormity of the wrong" and the defendant's financial status and potential liability. *Id.* at 939-40.

In turn, the federal constitutional excessiveness standard has three parts. *BMW of N. Am.,* 517 U.S. at 574. "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* "Evaluating reprehensibility involves inquiry into whether the injury was physical, whether it evinced a reckless disregard for the health of the target, whether the target had a financial vulnerability, and whether the injury was clearly intentional." *Degorski v. Wilson*, No. 04 CV 3367, 2014 WL 3511220, at *2 (N.D. Ill. July 16, 2014) (citing *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008)). The court must also consider the ratio of punitive damages to compensatory damages, which reflect the plaintiff's actual harm, and the difference between the punitive damages award and civil penalties that have been imposed for comparable misconduct. *Id.* at 580-83. The deterrent goal of punitive damages and the financial impact that an award will have on a defendant are also relevant. *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21-22 (1991). Generally, the results are the same under both the state and federal standards. *See Hammer*, 2015 WL 7776807, at *42.

### ii.     Pena's Request to Set Aside the Punitive Damages Award

The court first rejects Pena's request for a remittitur to zero based on his contention that his actions were justified. As discussed above, the jury found otherwise. Sufficient evidence supports that conclusion as the jury was entitled to determine the witnesses' credibility. Moreover, the court must give great deference to the jury's assessment of punitive damages so it may not "review the punitive damages award through the lenses of [Pena's] view of the evidence, which of course the jury rejected." *Hammer*, 2015 WL 7776807, at *46. Instead, "[t]he judicial function is to police a range, not a point." *Gracia v. Sigmatron Int'l, Inc.*, 102 F.

Supp. 3d 983, 993 (N.D. Ill. 2015) (quoting *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003)).

The jury's verdict reflects that it accepted that Pena falsified his report because he knew that Torres did not intentionally kick him when the parties were scuffling in the carport and that Correa did not realize that Pena was a police officer when she approached him from behind, but that Pena nevertheless forged ahead with serious criminal charges. Viewed through this lens, the jury was entitled to award punitive damages case to punish Pena and deter similar unprofessional conduct by Chicago police officers. The jury's decision to award punitive damages is, therefore, not "symptomatic of a 'runaway jury' that acted out of bias, prejudice or sympathy." *See Lally v. City of Chicago*, No. 10 C 5011, 2013 WL 1984422, at *7 (N.D. Ill. May 13, 2013). Accordingly, the court declines to reduce the punitive damages award to zero based on Pena's contention that he acted reasonably.

### iii. Pena's Request to Reduce the Punitive Damages Award

This brings the court to Pena's final fall-back argument: that the amount of punitive damages "must be reduced" by a significant amount.[13] (Dkt. 153 at 36; Dkt. 181 at 31.) Pena contends that his decision to charge Torres and Correa with aggravated battery "cannot be said to be reprehensible whatsoever" because the plaintiffs conceded that he had probable cause to charge them with simple battery. (Dkt. 81 at 28.) This is besides the point.

Torres and Correa were charged with *aggravated* battery. *See* 720 Ill. Comp. Stat. § 5/12-3.05 (defining aggravated battery). The jury in the state court criminal case reached a not

---

[13] In his reply memorandum, Pena suggests that if punitive damages are proper, which he contests, they should be in the range of $4,000 to $10,000. (Dkt. 181 at 29.)

guilty verdict, which is consistent with the federal jury's verdict on the plaintiffs' malicious prosecution claim based on the aggravated battery charges. Correa testified that they she was not aware that Pena was a police officer when she pushed Pena from behind. Torres testified that he kicked Pena in an accidental and glancing way. Pena is not entitled to impute his own knowledge of his employment as a police officer to Correa to support his decision to charge her with aggravated battery given that she pushed him from behind when he was not in uniform. And regardless of Torres' knowledge of Pena's status as a police officer, if Torres' version of events is credited, as it must be, Pena would have known that Torres did not commit aggravated battery by kicking him in an accidental and glancing manner.

The intentional filing of unfounded charges can have serious consequences. Pena has consistently sought to shift all of the blame for the decision to file felony aggravated battery charges onto Assistant State's Attorney Del Castillo, who approved those charges. As the court previously held, however, an individual—such as Pena—who played a significant role in causing the plaintiffs' prosecution can potentially be liable. (Dkt. 131 at 2-3.)

An intentional decision to bring false charges can satisfy the reprehensibility requirement; it is inherently reprehensible to bring false charges out of malice. *See Hardy*, 88 F. Supp. 3d at 881; *see also Mays v. Springborn*, No. 01-CV-1254, 2014 WL 3907769, at *5 (C.D. Ill. Aug. 11, 2014) (finding reprehensibility because "as has been repeated many times in this opinion, the jury has already determined that the strip search was unlawful and apparently believed the evidence put forth that was favorable to Plaintiff and supported Plaintiff's theory of the case," including that "Defendants' claim of contraband was merely a ruse to justify the search"). The jury credited the plaintiffs' evidence supporting their claim of purposeful police

misconduct. This type of abuse of a position of public trust can justify a substantial punitive damages award. *See Degorski*, 2014 WL 3511220, at *2.

The punitive damages award here also has a deterrent effect as it sends a message that intentionally providing false information to support felony charges is a serious offense that is not tolerated. *See Case v. Town of Cicero*, No. 10 C 7392, 2013 WL 5645780, at *10 (N.D. Ill. Oct. 16, 2013). Moreover, Pena does not challenge the 1:1.5 ratio of compensatory to punitive damages. This low single-digit ratio is "well within the range covered by precedent." *See Gracia*, 102 F. Supp. 3d at 993-94 (collecting cases); *Hardy*, 88 F. Supp. 3d at 883 (same).

With respect to damages awards in other cases, both sides champion comparisons to § 1983 cases with widely varying punitive damage awards in support of their positions that the punitive damages are reasonable (the plaintiffs) or clearly excessive (Pena). "The fact-specific nature of claims, particularly in the civil rights context, results in a dearth of apples-to-apples comparisons" so [a]ddressing every existing case (or even all of the cases cited by the parties) would be a fool's errand." *Hardy*, 88 F. Supp. 3d at 883. This is especially true given that numerous reported verdicts support both lower and higher punitive damages awards. *Id.*

Pena directs the court's attention to cases where the plaintiff suffered physical harm and received a lower punitive damages award than given to Torres and Correa. In support, Pena argues that these cases support his request for reduced punitive damages for the plaintiffs' malicious prosecution claims because the plaintiffs here did not suffer physical injuries. (Dkt. 153 at 35-36.) Comparing punitive damages awards in excessive force cases where the plaintiffs were physically injured is not particularly helpful given that the jury awarded damages based on malicious prosecution. Nevertheless, in cases involving plaintiffs who succeeded on excessive

force and malicious prosecution claims, juries have awarded substantially higher amounts that Torres and Correa received. *See*, *e.g.*, *Robinson v. City of Harvey*, 489 F.3d 864, 867 (7th Cir. 2007) ($275,000 in compensatory and punitive damages).

A disparity in damages awards is not enough, by itself, to undermine the punitive damages award here because "an exact analogy is not necessary." *Adams*, 798 F.3d at 545 (quoting *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006)). The court, instead, must consider "whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (citing *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011)). The Seventh Circuit directs that this inquiry "is not as important as the review of the evidence in the case at hand; it offers at best a rough approximation of damage awards." *Id*. at 545.

The plaintiffs have directed the court's attention to two cases involving a plaintiff's verdict on a malicious prosecution claim alone where Mr. Jackowiak (one of the plaintiffs' attorneys in this case) represented the plaintiffs.[14] In *Collins v. City of Chicago*, a jury awarded $1,000,000 for past emotional distress and loss of a normal life based on a finding that the police officer defendant did not have probable cause to commence and continue felony criminal charges. *See* No. 12 L 12389, 2013 WL 5771217 (Sept. 24, 2013) (West's "verdict and

---

[14] The defendants criticize the plaintiffs' citation to two state court verdicts using the case title, case number, and date. They correctly note that the plaintiffs did not provide the unpublished orders at issue or any accompanying materials that support their parenthetical descriptions. Thus, they contend that the court should disregard these cases. The plaintiffs' citations are insufficient. However, the defendants' criticism of the plaintiffs' authority is like the pot calling the kettle black, given the defendants' issues with authority. The court was able to locate some state court materials from the referenced cases on Westlaw. It will consider those materials.

settlement summary"); No. 12 L 12389, 2013 WL 5761216 (Sept. 24, 2013) (order regarding verdict). In *Rivera v. Vill. of Streamwood*, the plaintiff who was knocked to the ground by a police officer who stood by while the officer's dog bit the plaintiff in the leg and groin. The plaintiff filed suit after the state court dismissed aggravated battery charges. A jury awarded $200,000 on the plaintiff's malicious prosecution claim, but the jury rejected his wilful and wanton misconduct claim. *See* No. 07 L 3536, 2010 WL 2025557 (Mar. 19, 2010) (West's "verdict and settlement summary"); No. 07 L 3536, 2010 WL 2005924 (Mar. 19, 2010) (judgment order).

The materials before the court from *Collins* and *Rivera* do not state how the jury apportioned compensatory and punitive damages (to the extent that punitive damages were awarded). Thus, they are not persuasive given that the plaintiffs have not provided the court with support for their contention that the plaintiffs in *Collins* and *Rivera* prevailed only on their malicious prosecution claims and received higher punitive damage awards than the plaintiffs in this case.

The court has already recapped the jury's findings. Suffice it to say that with respect to the malicious prosecution claims, the jury disbelieved Pena, believed the plaintiffs' witnesses, and concluded that Pena maliciously pursued unfounded aggravated battery charges. The court "will respect the jury's within-reason determination of the appropriate punitive message based on the jury's review of the evidence," *Gracia*, 102 F. Supp. 3d at 994, as the punitive damages award "lie[s] well within the universe" of malicious prosecution verdicts, when the evidence is viewed in the light most favorable to the plaintiffs, *Adams*, 798 F.3d at 546.

Last but not least, the court notes that the City's attorneys also represented the defendant officers. The City, unlike Pena, might prefer that a jury apportion damages to avoid compensatory damages in favor of punitive damages, as happened here. This inherent conflict came up mid-trial in the context of the jury instructions, when the court noted that the plaintiffs were seeking punitive damages that the officers "would have to pay out of their pocket." (Dec. 16, 2015 Tr. at 27.) Defense counsel affirmatively represented that they did not intend to present evidence about the officers' financial condition. (*Id*. at 28) (The Court: "So let me ask you this. Are you going to be arguing that there shouldn't be punitive damages because the defendants have children to support?" Mr. Battle: "No." The Court: "So basically this is sort of a non-issue maybe." Mr. Schumann: "Right . . . . The financial condition has not been—has not been elicited, and we withdraw financial condition . . . .").

Thus, defense counsel made a conscious decision not to introduce any evidence about the financial impact that a significant punitive damages award would have on the individual officers. Relatedly and as discussed above, defense counsel also asserted invoked the Illinois Governmental Tort Immunity Act too late. These decisions are not consistent with Pena's best interests, as they left the officers open to the type of significant punitive damages award that Pena is currently facing. *See Sailsbery v. Vill. of Sauk Vill.*, No. 15 C 10564, 2016 WL 1402291, at *8 (N.D. Ill. Apr. 11, 2016) (voicing concern about the chance that an attorney who represents an entity and one of its employees may face a conflict due to the tension between reducing punitive damages for the individual versus reducing compensatory damages for the entity).

Generally, if a defendant advises the jury that an individual officer is personally responsible for punitive damages, then "fairness would dictate that the jury also be informed of

the true situation (indemnification) as to compensatory damages." *Martinez v. City of Chicago*, No. 14-CV-369, 2016 WL 3538823, at *13 (N.D. Ill. June 29, 2016) (quoting *Galvan v. Nordberg*, 2006 WL 1343680, at *2 (N.D. Ill. May 10, 2006)).  Defense counsel elected to take these issues off the table by choosing to keep the City's obligation to indemnify the officers for compensatory damages from the jury at the price of not presenting evidence regarding their finances for the purpose of punitive damages.  This left the jury with no information about Pena's responsibility for a punitive damages award or his financial situation.

Pena (through defense counsel who also represents the City) does not argue that the court should take his personal circumstances into account when ruling on his request for remittitur. Setting aside concerns about defense counsels' seeming conflict of interest, Pena's counsel made a deliberate choice not to present this evidence to the jury.  Moreover, the only support for a claim of inability to pay is the commonsense conclusion that $105,000 will, at best, severely tax the means of a city servant.  Speculation based on an argument not presented by a party is not a sound basis for reduction of the punitive damages award.

In sum, the court recognizes that a total of $105,000 in punitive damages is a very significant amount for an individual to pay.  However, the jury decided to award punitive damages of $60,000 (Torres) and $45,000 (Correa) in punitive damages in a 1:1.5 ratio based on compensatory damages of $40,000 (Torres) and $30,000 (Correa).  The jury's verdict means that it necessarily must have concluded that Pena intentionally and maliciously lied when preparing his police report.  For the reasons discussed above, this does not violate due process principles and is supported by evidence presented at trial.  *See Hardy*, 88 F. Supp. 3d at 880-82.  It is also generally in line with other plaintiffs' verdicts in police misconduct cases, which are necessarily

very fact-specific.  *See id*. at 883.  For all of these reasons, the court declines to disturb the jury's punitive damages award.

### IV.  Conclusion

For the above reasons, the plaintiffs' motion for judgment as a matter of law [149] and defendant Henry Pena's motions for judgment as a matter of law, a new trial, to alter judgment, to amend the judgment, and, in the alternative, for remittitur [144] [150] are denied.


Date:  August 5, 2016                    _____/s/_____
                                         Joan B. Gottschall
/cc                                      United States District Judge